Harry **CROSHAW**, Plaintiff,

v.

**KONINKLIJKE NEDLLOYD, B. V. RIJSWIJK,** Defendant.

Civ. No. 74–250.

United States District Court, D. Oregon.

July 31, 1975.

Croshaw approached the deck block in order to gather the loose line and tie it to the lines running to the upper deck. He was unfamiliar with the Kingston's type of deck block but assumed from the slack in the lines running overhead from it that it was resting at a fixed angle. He straddled the block while tying the lines. Contrary to his assumption, the block was raised. It toppled onto his foot.

Plaintiff seeks recovery under the Oregon Employer's Liability Act (ORS 654.305, 654.315; "OELA"), the Occupational Safety and Health Act (29 CFR § 1910.16 et seq.; "OSHA"), and the Longshoremen's and Harbor Workers' Compensation Act (33 U.S.C. 905(b) Supp.1974).

Pozzi, Wilson & Atchison, Portland, Ore., for plaintiff.

Wood, Wood, Tatum, Mosser & Brooke, Portland, Ore., for defendant.

## OPINION

SKOPIL, District Judge:

Plaintiff, an Oregon resident, brings this maritime personal injury action against defendant shipowner, a corporation of a foreign nation. 28 U.S.C. § 1332. On April 2, 1973, plaintiff worked on board defendant's vessel the M S Nedlloyd Kingston (Kingston), then berthed in navigable waters in Portland, Oregon. He was employed by Jones Oregon Stevedoring Co. (Stevedore), which was performing stevedoring services for the Kingston pursuant to contract. While plaintiff was helping load the Kingston, one of the ship's hoisting blocks fell on his foot.

Plaintiff was injured at 9:00 a. m. on April 2, an hour after he began working in the lower tween deck. His gang's progress in stowing cargo became impeded by loose line on the deck. The line was part of a hoisting mechanism which opened and closed the ship's accordian-type hatch covers. The line ran at a 45 degree angle between an overhead block in a fore position and a deck block in an aft position. The deck block was mounted in a recess below deck level, enabling it to swing forward and aft and allowing the wheel frame to swivel.

## THE OELA CLAIM

██ The OELA imposes a stricter standard upon the employer than either general maritime law or Section 905(b) negligence law. Congressional history demonstrates that Section 905(b) was intended to create a uniform federal law which would preempt conflicting state statutes. S.Rep.No.1125, 92d Cong., 2d Sess. 102; H.R.Rep.No.1441, 92d Cong., 2d Sess. 8 (1972); 1972 U.S.Code Cong. & Admin.News, p. 4698. Consequently, the OELA does not apply to this action. *Birrer v. Flota Mercante Grancolombiana*, 386 F.Supp. 1105 (Or.1974).

## THE OSHA CLAIM

██ OSHA standards do not automatically apply because their application is expressly limited to employers. *Hite v. Maritime Overseas Corporation*, 375 F.Supp. 233 (E.D.Texas 1974). See *Moragne v. States Marine Lines*, 398 U. S. 375, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). Legislative history reveals that Congress did not intend to impose liability under the Safety & Health Regulations for Longshoring (33 U.S.C. § 941) upon shipowners for injuries to business invitees or their coworkers. 3 U.S.Code & Admin.News, pp. 4703–4704 (1972).

But plaintiff asserts that defendant has bound itself to those standards by contract. A stevedoring contract (Contract) was executed by plaintiff's employer and the defendant on July 1, 1971. In that document defendant agreed to

"maintain [ship's gear used in stevedoring] in safe and efficient working condition during the progress of the work and . . . *abide* by the provisions of the Pacific Maritime Association Safety Code and the Safety Regulations as administered by the United States Occupational Safety and Health Administration." (emphasis supplied)

Plaintiff contends that this provision (the provision) obligated the defendant to affirmatively fulfill all provisions of the Code and the Regulations. Consequently, he argues, defendant's noncompliance with 29 CFR § 1504.91(b), 1910.22(a)(1) and (b)(1) constitutes negligence per se.

■ The drafter of the contract has created unnecessary confusion by his unfortunate choice of terminology. The term "abide by" generally means "to adhere to, acquiesce in, conform to, accept as valid, and take the consequences of". *Kovach v. Maddux*, 238 F.Supp. 835 (M. D.Tenn.1965).

Defendant suggests that the term was used in recognition of the shipowner's agreement to cooperate with the stevedore in fulfilling his duties under the OSHA. Given that interpretation, the reason for including the provision in the contract eludes me because it is difficult to see how the shipowner could lawfully do otherwise.

■ It is equally difficult to perceive why the shipowner in this case would bind himself to higher standards of safety than required by law. In the absence of a clear expression of such intent in a contract, I am unwilling to bind defendant to the stricter standards. I declare the provision void.

## NEGLIGENCE UNDER THE 1972 AMENDMENTS

Defendant must then be found liable, if at all, under the Section 905(b) negligence standard. The parties are embroiled in considerable dispute as to what that standard is.

Defendant states that its duty to Crowshaw was limited to a warning of latent dangers of which defendant knew or should have known if an expert stevedore could not reasonably be expected to encounter such dangers. *Ramirez v. Toko Kaium K. K.*, 385 F.Supp. 644 (N. D.Cal.1974); *Metropolitan Stevedore Company v. Dampskisaktieselskabet International*, 274 F.2d 875 (9th Cir. 1960); *Hite v. Maritime Overseas Corporation*, 380 F.Supp. 222 (E.D.Texas 1974); and *Fedison v. Vessell Wislica*, 382 F.Supp. 4 (E.D.La.1974).

Plaintiff contends that the shipowner was under the shadow of a much stricter, non-delegable duty to provide longshoremen with a safe place to work. *Gutierrez v. Waterman Steamship Corp.*, 373 U.S. 206, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *Albanese v. N. V. Nederl. Amerik Stoomv. Maats*, 382 U.S. 283, 86 S.Ct. 429, 15 L.Ed.2d 327 (1965); *Atlantic and Gulf Stevedores v. Ellerman Lines, Ltd.*, 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798 (1962). Plaintiff objects to defendant's claim that the hazardous block which allegedly caused plaintiff's injury was an "open and obvious defect" which exonerates it from liability. He characterizes that defense as a camouflaged assertion of assumption of the risk, which is forbidden by the 1972 amendments, as well as general admiralty law. 3 U.S.Code Cong. & Admin. News, 92d Cong., 2d Sess.1972, pp. 4701–4705; *The Arizona v. Anelich*, 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075 (1935).

■ The 1972 amendments were intended to reduce the expensive, protracted litigation caused by the prevailing pattern of triangular indemnity actions. In 1927 Congress had passed the origi-

nal Longshoremen's and Harbor Workers' Compensation Act of March 4, 1927 (Longshoremen's Act), Pub.L.No. 69–803, codified at 33 U.S.C. § 901 et seq. (1970). This compensation plan was intended to replace the liberal remedies of the Jones Act, under which longshoremen had been suing their employers. 46 U.S.C. § 688 (1958); *Atlantic Transport Co. v. Imbrovek,* 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914). The Longshoremen's Act permitted actions by the longshoremen against the vessel. The governing "unseaworthiness" doctrine formulated by the judiciary in *Seas Shipping Co. v. Sieracki,* 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946), had recently approached the status of absolute liability. See H.R.Rep.No.92–1125, 92d Cong., 2d Sess. 8–9 (1972). *Ryan Stevedoring Co. v. Pan-Atlantic S. S. Corp.,* 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133 (1956), established an avenue for relief through which the defendant vessel could seek redemption from the stevedoring company for its concurrent negligence. Consequently, the stevedore-employer might become indirectly liable to the longshoreman for greater damages than were recoverable through a direct Workman's Compensation claim. The potential rewards of this circular procedure made it increasingly popular.

That procedure drew increasing criticism, notably from Congress, which deplored the waste of judicial and financial resources involved. See H.R.Rep. No.92–1441, 92d Cong., 2d Sess. 5 (1972); S.Rep.No.92–1125, 92d Cong., 2d Sess. 9 (1972). The 1972 amendments proposed to eliminate that waste. They impose higher compensation payments upon the stevedore, but immunize him from redemption actions by the vessel. The longshoreman enjoys greater compensation benefits, but sacrifices the leverage of the seaworthiness standard, which is replaced by negligence law.

■■ The negligence standard to be used under the amendments should mirror that which is imposed upon land-based persons under similar circumstances. H.R.Rep.No.92–1441, 92d Cong., 2d Sess. 6 (1972); S.Rep.No.92–1125, 92d Cong., 2d Sess. 10 (1972). Maritime concepts such as the "nondelegable duty" notion advanced by plaintiff were expressly eliminated. *Lucas v. "Brinknes" Schiffahrts,* 379 F.Supp. 759 (E.D.Pa.1974); *Ramirez v. Toko Kaiun K. K., supra.* The shipowner does not owe the longshoreman a duty to provide him with a safe place to work. *Parker v. Costa Amatori S. P. A.,* Civ. C–72–454–N (E.D.Va. April 23, 1975); *Citizen v. M/V TRITON,* 384 F.Supp. 198 (E.D.Texas 1974); *Fedison v. VESSEL WISLICA,* 382 F.Supp. 4 (E.D.La.1974).

The nature and scope of the landowner's duty is also in dispute. I conclude that the standards chosen in *Aneszewski v. Dynamic Marina Corp.,* (D.C.Md. 1975, 391 F.Supp. 1143), and *Frasca v. Prudential-Grace Lines, Inc.,* 394 F. Supp. 1092 (D.C.Md.1975), reflect the soundest view and the one most consistent with the purpose and history of the 1972 amendments.

■ Those standards are best expressed by the Restatement (Second) of Torts § 343 (1965):

"A [shipowner] is subject to liability for physical harm caused to his invitees by a condition on the [ship] if, but only if, he

"(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

"(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

"(c) fails to exercise reasonable care to protect them against the danger."

■ The shipowner is not liable for dangerous conditions created by the stevedore's negligence while the stevedore has exclusive control over the manner and area of the work. *Frasca, supra;* Prosser § 71 at 468–70; Restate-

ment (Second) of Torts § 409 (1965) (hereafter "Restatement"). This rule has exceptions (Restatement, *supra* §§ 409–429), but unless notice of the condition was given to the ship's crew, the stevedore generally has the primary duty to rectify such conditions. *Lucas v. "Brinkes" Shiffahrts Ges., supra; Frasca, supra.* Shipowners retain the initial obligation to provide invitees with a reasonably safe place to work. They also have liability for the negligence of any independent contractor which they hire to repair or remedy the condition. Prosser § 71 at 470–1; Restatement § 425. In essence,

"[t]he shipowner . . . owe[s] the same duty to the plaintiff longshoreman as a landowner owes to an employee of an independent contractor. That duty is to exercise due care to turn the work area over to the control of the stevedoring company in a reasonably safe condition and to take reasonable precautions once he has actual or constructive knowledge of dangers arising thereafter." *Frasca, supra.*

He is not liable for failure to inspect and discover dangerous conditions arising after exclusive control of the work is assumed by the stevedore. *Slaughter v. S. S. RONDE,* 390 F.Supp. 637 (S.D. Ga.1974).

■ Contrary to the traditional view, proof that the dangerous condition was obvious or known to an invitee who realized the danger will not necessarily absolve the shipowner from liability. If the shipowner "should anticipate harm despite such knowledge or obviousness", he may be held liable. Restatement § 343A(1) (1965).

"In any case where the [shipowner], as a reasonable man should anticipate an unreasonable risk of harm to the invitee notwithstanding his knowledge, warning, or the obvious nature of the condition, something more in the way of precautions may be required. This is true, for example, where . . . the condition is one

such as icy steps, which cannot be negotiated with reasonable safety even though the invitee is fully aware of it. . . . " Prosser § 61.

"In such cases, of course, the fact that the condition is known or obvious is still important in determining the issue of the plaintiff's contributory or comparative negligence. Restatement (Second) of Torts § 343A, comment f, at 220 (1965). 'It is not, however, conclusive in determining the duty of the [owner], or whether he has acted reasonably under the circumstances.' " *Frasca, supra.*

■ In the case at bar I find that the block which caused Croshaw's injury was in a dangerous condition when he approached it and that he was injured by the block's fall. It is more difficult to determine who was responsible for the block's precarious position.

Normally the only activity which affects the block's position is the opening or closing of the overhead hatch. It may reasonably be inferred that this operation prior to the accident caused the block to hang up. Hatch openings and closings are customarily longshoremen's work. That work was exclusively reserved to them by contract with the Nedlloyd. According to the weight of testimony, however, the Nedlloyd hatches were actually operated by the ship's crew rather than by the longshoremen. The Nedlloyd's accordian-type hatch covers were somewhat unusual. Because of their complexity, the longshoremen's lack of familiarity with them, and the risk involved when they were operated by unfamiliar hands, the shipowner delegated their operation to his crew. In conformity with his contract with the longshoremen, the hatches were never operated unless the longshoremen were standing by. The ship's log credited them with performance of the hatch openings and closings, and they were paid accordingly.

■ No one could testify that the ship's crew had actually opened the lower 'tween deck lid before Croshaw's acci-

dent, but the ship's policy was apparently well respected. According to testimony of the gang boss, even when that hatch is opened by the crew, longshoremen do the necessary work in the hold. Because both the crew and the stevedore were involved in this operation, I conclude that they both had a duty to exercise reasonable care to discover any dangerous conditions created by operation of the hatch-opening gear. Although none of the crew were customarily present in the hold during those operations, the shipowner was responsible for the gear in the hold. This duty is particularly appropriate because of the shipowner's concession that he did not trust the longshoremen's competency to operate the gear on their own. Because the stevedore had physical control of the hold during these operations and engaged his employees in the operation, he also assumed responsibility.

█ I further find that the shipowner and the stevedore were negligent in failing to exercise reasonable care to discover the dangerous condition of the block or to warn or otherwise protect the longshoremen from that condition if they had knowledge of the condition.

█ Judging from pictures of the block, the precarious elevation of the block which caused Croshaw's injury would have been obvious to the naked eye. Crowshaw's lack of familiarity with the block did not excuse him from a duty of inspection. His failure to make a reasonable inspection and the manner in which he worked near the block constituted contributory negligence.

I conclude that plaintiff's negligence was 50% responsible for his injuries, the shipowner's negligence was 20% responsible, and the stevedore's negligence was 30% responsible.

### THIRD PARTY PROBLEMS

This conclusion opens the Pandora's box of third party redemption problems Congress attempted to close with the 1972 amendments. The shipowner claims that it cannot be held liable for the stevedore's 30% negligence. The plaintiff contends that the 1972 amendments foreclose such an offset. He argues that a tortfeasor may be held liable for full damages in spite of the concurrent negligence of a third party. Plaintiff concedes that his contributory negligence reduces defendant's liability by 50%.

█ Plaintiff's position is the prevailing law in this district. In *Hubbard v. Great Pacific Shipping Co., Monrovia,* Civ. 74–289 (Or. June 16, 1975), Chief Judge Belloni ruled that a defendant shipowner is not entitled to any offset according to the proportion of the stevedore's respective negligence. He concluded that an offset would

"have the result of negating Congress's intent of eliminating direct or indirect third-party actions in longshoreman-injury cases as embodied in the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act. This is simply a case of concurring negligence of the defendant-shipowner and the Stevedore which, under a negligence theory, still entitled the plaintiff to a judgment against the defendant-shipowner in the full amount of his damages." *Id.* at 4.

I must conform to the *Hubbard* decision in order to maintain uniformity of law within the district. Consequently the shipowner may not offset the stevedore's negligence against the plaintiff's judgment.

█ I respectfully disagree, however, with Judge Belloni's interpretation of the 1972 amendments. Congressional intent is unfortunately obscure on this issue, but I believe that the legislative scheme, construed in its entirety, does contemplate an offset in these circumstances.

Under Section 905(b) of the Act,

"In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such

person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party . . . and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or warranties to the contrary shall be void . . ."

Congress drafted this provision in order to eliminate the type of indemnity actions predicated upon the *Ryan Stevedoring Company, supra,* decision. *Ryan* held that notwithstanding his immunity from suits by the employee and tort actions by the shipowner guaranteed him by the Longshoreman's Act (as then written), the stevedore could be held liable upon his contractual obligation to the shipowner to perform services in a workmanlike manner.

In consideration for eliminating the shipowner's *Ryan* remedy, Congress sought to absolve the shipowner from liability for the stevedore's negligence. That concern focused primarily upon the seaworthiness doctrine, which had subjected vessels to liability for actions or omissions of stevedores and their employees. See, e. g., *Crumady v. Joachim Hendrik Fisser,* 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413 (1959). *Albanese v. Matts,* 382 U.S. 283, 86 S.Ct. 429, 15 L. Ed.2d 327 (1965). By replacing the seaworthiness doctrine with negligence standards, Congress intended to

> "place an employee injured aboard a vessel in the same position . . ., insofar as bringing third party damage action is concerned, and not to endow him with any special maritime theory of liability . . .

> "Thus a vessel shall not be liable in damages for acts or omissions of stevedores or employees of stevedores subject to this Act, for the manner or method in which stevedores or employees of stevedores subject to this Act perform their work, for gear or equipment of stevedores or employees of stevedores subject to the Act whether used aboard ship, or ashore,

or for other categories of unseaworthiness which had been judicially established." Legislative History, p. 4703 (citations omitted)

At first blush, then, the 1972 amendments seem to contain a "catch-22". Shipowners are not to be liable for negligence of the stevedore, the stevedore cannot be held liable for it either, but the injured plaintiff is entitled to damages for it. No explicit remedy for this paradox is provided by the Act.

The *Hubbard* solution sidesteps the problem. It would apparently apply comparative negligence between the shipowner and the plaintiff as dictated by the Act and accept reduction of damages by the percentage of the plaintiff's comparative negligence. But the shipowner is held liable for the remainder, regardless of the stevedore's concurrent negligence. The inequities of this program are obvious. If the stevedore were 90% negligent, the 10% negligence of the shipowner would be sufficient to cripple him with the entire judgment. Some jurisdictions tolerate this, but I cannot.

The defendant shipowner pursues an offset to his liability under the "Murray Credit Doctrine". *Murray v. United States,* 405 F.2d 1361 (D.C.Cir. 1968). Under *Murray* the stevedore would be considered to have "settled" plaintiff's claim against him by making Compensation Act payments.

> "[T]hough unable to obtain contribution because the [stevedore] ha[s] 'bought his peace,' [the shipowner] is nonetheless protected by having his tort judgment reduced by one-half, on the theory that one-half of the claim was sold by the victim when he executed the settlement." *Murray, supra* at 1365–66.

Although this scheme does afford the shipowner some credit for the stevedore's negligence, its mathematical approach is unnecessarily arbitrary and inflexible. *Murray* applies a 50% reduction regardless of whether the stevedore's negligence was 50% or 5%.

A more equitable resolution is proposed by J. Cohen and D. Dougherty, "The 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act: An Opportunity for Equitable Uniformity in Tripartite Industrial Accident Litigation", 19 N.Y.L. F. 587 (1974). I adopt that proposal in the following form:

1. Plaintiff retains his no-fault compensation benefits in full.

2. His recovery against the shipowner is reduced by the percentage of his own negligence.

3. The shipowner's liability is reduced by the percentage of the stevedore's negligence, as well as that of the plaintiff.

4. The stevedore is not liable for damages because the Act limits his exposure to compensation payments. Furthermore, he may enforce his equitable lien against plaintiff's recovery from the shipowner. Because his own negligence has reduced plaintiff's recovery by 30%, however, his lien is diminished by the amount that percentage constitutes of the total judgment.

The manifest injustice of subjecting a joint tortfeasor to an arbitrary level of damages despite minimal culpability was recently condemned by the U. S. Supreme Court. In *United States v. Reliable Transfer Co., Inc.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975), the Court jettisoned the ancient admiralty rule of divided damages. The divided damage rule, most used in vessel collision cases, compelled an equal distribution of damages among joint tortfeasors without regard to their relative degree of fault. The Court viewed the rule as "an ancient form of rough justice, a means of apportioning damages where it was difficult to measure which party was more at fault". 421 U.S. 403, 95 S. Ct. at 1712. It had been adopted in 1854 by the United States from prevailing English law but had since been replaced by comparative negligence in every major maritime nation, including England. The Supreme Court concluded that

"It is no longer apparent, if it ever was, that this solomonic division of damages serves to achieve even rough justice. An equal division of damages is a reasonably satisfactory result only where each vessel's fault is approximately equal and each vessel thus assumes a share of the collision damages in proportion to its share of the blame, or where proportionate degrees of fault cannot be measured and determined on a rational basis. The rule produces palpably unfair results in every other case." 421 U.S. 405, 95 S.Ct. at 1713.

This same intolerance for arbitrary and inequitable damage rules which motivated the *Reliable Transfer* decision moves me to adopt the approach I have outlined today. *Reliable Transfer* overruled a century and a half of judicial precedent. I need not overcome such formidable obstacles. The 1972 amendments expressly authorize comparative negligence. Congress has left the mechanics of its application to the courts, as is customary.

An objection may be raised that depriving the stevedore of his lien may constitute "indirect liability" of the type expressly forbidden by Section 905(b). That restriction, in fact, was the basis of the *Hubbard* opinion. This reasoning ignores the distinction between legal and equitable rights. The indirect liability proscribed by Section 905(b) concerned legal rights and remedies. Congress drafted that proscription in order to eliminate indemnity actions and warranty provisions which had been exposing stevedores to liability for personal injury awards based on the shipowner's negligence or the "unseaworthiness" of his vessel. Legislative history does not reveal whether Congress intended to protect the stevedore's equitable lien from his own negligent conduct as well. Such protection does not appear justified and would clearly violate fundamental principles of equity.

The stevedore has a statutory assignment of the workman's right to sue third parties if the workman does not institute a suit within six months of a compensation award. No assignment is made if compensation is paid in the absence of an award. 33 U.S.C. § 933(a). If the workman brings a third party action without an award, however, the employer still has a lien upon the award in the amount of the compensation benefits he has paid the plaintiff. *The Etna*, 138 F.2d 37 (3d Cir. 1943); *Fontana v. Pennsylvania R. Co.*, 106 F.Supp. 461 (S.D.N.Y.1952). In either event the employer's right of reimbursement is an equitable one. *The Etna, supra.* As such, it is "a mere floating equity until a judgment or decree . . . is rendered. It is not an estate in the property, or a right to recover it, but is merely a charge thereon for the purpose of security." 53 C.J.S. "Liens" § 1, pp. 831–2. See *Landon v. Lief Hoegh and Co., Inc.*, 521 F.2d 756 (2d Cir. 1975).

The stevedore's right to reimbursement, being equitable in nature, is subject to equitable regulation. 1A Benedict on Admiralty (6th ed. 1973), § 119, p. 6–33. There is no equity in the principle that a stevedore should be allowed to enforce an unmitigated lien on a personal injury judgment which has been reduced because of the stevedore's concurrent negligence. If his lien is to be truly equitable, it must be diminished according to that negligence.

If my proposal is to become law, it must afford the stevedore due process. Future cases will have to define the substance and procedure of this protection. Fed.R.Civ.P. 24 provides the stevedore with means of intervening to protect his interest if he so desires. It would seem that the Court should assume responsibility for guaranteeing that he receives notice. The Court could require the defendant shipowner to provide such notice when he pleads the comparative negligence of the plaintiff. Alternatively, the Court could provide notice on its own initiative through the Clerk's office.

Neither step may be constitutionally required, but it is favored by interests of fairness and expediency. But see *Landon, supra.* If notice is not provided and the stevedore's lien is determined to qualify him for intervention of right, he may be able to intervene even after final judgment. See 2 Barron & Holtzoff (Wright ed.), § 594 nn. 36, 37; *Securities and Exchange Comm. v. United States Realty & Improvement Co.*, 310 U.S. 434, 60 S.Ct. 1044, 84 L.Ed. 1000 (1940). This would result in the protracted litigation the 1972 amendments were designed to eliminate.

In the case at bar I find that plaintiff suffered damage in the amount of $20,000. The *Hubbard* rule requires me to reduce those damages by plaintiff's 50% contributory negligence.

Judgment is hereby entered for the plaintiff in the amount of $10,000.

This Opinion shall constitute findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).