James A. DAVIS, Plaintiff,

v.

INCA COMPANIA NAVIERA S.A., a corporation, Defendant.

No. C76–336B.

United States District Court,
W. D. Washington.

Sept. 28, 1977.

Harold F. Vhugen, Levinson, Friedman, Vhugen, Duggan & Bland, Seattle, Wash., for plaintiff.

Theodore A. LeGros, Howard, LeGros, Buchanan & Paul, Seattle, Wash., for defendant.

## OPINION

BEEKS, Senior District Judge.

This is an action instituted pursuant to § 905(b) [1] of the 1972 Amendments to the

---

1. In pertinent part, § 905(b) provides:
   In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . . may bring an action against such vessel as a third party . . . and the employer shall not be liable to the vessel for such damages directly or indirectly and any agreements or

Longshoremen's and Harbor Workers' Act, 33 U.S.C. §§ 901 et seq.,[2] (LHWCA) in which plaintiff longshoreman seeks to recover damages for personal injuries sustained on January 12, 1975 as a result of the alleged negligence of defendant.

Defendant is the owner of the Japanese built steam tanker ARCHON, a flush deck vessel of Liberian registry, 866.17 feet in length, 124.67 feet in breadth with her superstructure and engine located aft.

Her entire main deck, which has a camber of one meter from the centerline to the sheer strake, was painted with a non-abrasive paint from the forward end of the main house to the after end of the forecastle head. However, two "non-skid" walkways, one the centerline catwalk running fore and aft the length of the deck, the other running athwartships from the gangway on each side and intersecting the fore and aft walkway at right angles, were provided by using an abrasive additive to the deck paint.

On the morning of January 12, 1975, ARCHON, then in the course of her maiden voyage, was berthed at Pier 1, Tacoma, Washington, the United Grain Terminal. She had been loading bulk wheat destined for Karachi, Pakistan, for five days. During this period grain kernels and wheat chaff had accumulated on the deck, effectively blanketing the entire area. Such accumulation is characteristic of grain loading operations where, as here, the wheat is gravity fed through spouts extending from the silo into butterworth openings in the deck and the downward force of the grain agitating the wheat in the tank creates a back pressure which sprays some of the kernels and dust up onto the deck. Thus, the gathering of wheat dust on deck is inherent in the operation. It is customary, undoubtedly for reasons of economy, not to sweep or otherwise clean the deck after each day of loading operations, but rather to wait until the vessel commences her voyage and allow the accumulated residue to be washed away by the sea as it breaks over the vessel's low freeboard. Apparently this was the course of conduct defendant intended to pursue, because from the time of arrival in Tacoma, there had been no attempt to clean the deck, and the chaff had continued to pile up. Moreover, it had been raining during the night of January 11 or the following morning before loading resumed, and consequently, the grain residue was wet and the deck exceptionally slippery.

At approximately 0800, plaintiff, who had never previously been on ARCHON, reported for work and was assigned a work station near the No. 1 butterworth situated forward close to the break bulkhead of the forecastle. He then proceeded up the gangway. Reaching the top of the gangway, plaintiff could see the grain and wheat dust and knew the substance was slick, but he could not see the "non-skid" passageways. They were obscured. In order to reach his work station, he turned left and began to walk cautiously forward on the deck between the centerline and the port side. After he had taken approximately ten steps, he slipped on an accumulation of wet wheat dust and kernels covering the smooth steel deck and fell.

The Court is satisfied that the deck area where plaintiff fell was extremely hazardous, not only because of the wheat residue but also because of the downward and outward slope of the deck resulting from the camber, and possibly a port list.

During the morning of January 12, prior to plaintiff's boarding the vessel, the Chief Officer had inspected the entire deck area.

warranties to the contrary shall be void. If such person was employed by the vessel to provide stevedoring services, no such action shall be permitted if the injury was caused by the negligence of persons engaged in providing stevedoring services to the vessel . . . . The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. The remedy provided in this subsection shall be exclusive of all other remedies against the vessel . . . .
33 U.S.C. § 905(b) (Supp.1977)

2. Act of Oct. 27, 1972, Pub.L.No. 92–576, 86 Stat. 1263, amending 33 U.S.C. §§ 901 et seq. (1970).

This being so, these hazardous conditions must have been known to him and thus to defendant. Furthermore, he knew that the vessel had "non-skid" walkways which were designed to and would have provided safe access to the forward work site. He must also have known that these walkways were obscured by the accumulations of chaff. Nevertheless, he did nothing to alleviate the danger. He did not exercise his authority to direct a clean up of the residue. He did not station anyone at the gangway to indicate to arriving longshoremen the existence of the "non-skid" walkway. Nor did he post or cause the posting of any sort of informational sign.

Counsel for both parties have urged that this case requires the Court to determine the nature and scope of a vessel owner's duty of care under the 1972 Amendments. Plaintiff contends that maritime principles of negligence are applicable; that defendant breached a duty of reasonable care to provide a reasonably safe place to work and was negligent in failing to correct the hazardous deck condition. Defendant, on the other hand, argues that LHWCA as amended requires application of common law negligence standards, invoking, *inter alia,* those formulated in Restatement (Second) of Torts (1965) §§ 343 and 343A, relating to the duties of land occupiers to invitees with respect to conditions on their premises.

The 1972 Amendments are silent with respect to the applicable standard of care. Accordingly, the legal waters surrounding the question of the proper standard have swirled turgidly with confusion and controversy.[3] Notwithstanding the urging of counsel, I do not believe the instant action involving a vessel owner with actual knowledge of a perceptibly dangerous condition requires me to plunge into the jurisprudential maelstrom, for I conclude that under any of the standards which can be authoritatively urged[4] plaintiff would be entitled to prevail.

---

**3.** *See generally* G. Gilmore and C. Black, The Law of Admiralty, 453–55 (2d ed. 1975); Robertson, *Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harborworkers' Compensation Act,* 7 J. Maritime Law and Commerce 1 (1976); Robertson, *Jurisdiction, Shipowner Negligence and Stevedore Immunities Under the 1972 Amendments to the Longshoremen's Act,* 28 Mercer L. Rev. 515 (1977); Sheak, *Negligence Standards Under the 1972 Amendments to the LHWCA: Examining the Viewpoints,* 21 Vill.L.Rev. 773 (1974); Thompson, *Duty Owed by a Shipowner Under 1972 Amendments Is that of Land Based Premises Owner to Business Invitee,* 6 J. Maritime Law and Commerce 643 (1975); Vickery, *Some Impacts of the 1972 Amendments to the Longshoremen's and Harborworkers' Compensation Act,* 41 Ins.Counsel J. 63 (1974); Note, *The Injured Longshoreman v. the Shipowner after 1972,* 23 Hastings L.J. 771 (1977).

**4.** The potentially apposite standards are the formulation of Restatement (Second) of Torts (1965) §§ 343–343A, the maritime standard of negligence articulated by the Supreme Court in *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 632, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959), and the standard of care recently proposed in *Gallardo v. Westfal-Larsen & Co. A/S,* 435 F.Supp. 484 at 491 (N.D.Cal.1977). Defendant invited the Court to apply Restatement § 409 which, subject to many exceptions, absolves an owner of premises who employs an independent contractor from any liability for harm caused by the negligence of the independent contractor or his employees after relinquishing control of the premises owner to the independent contractor. *See* Restatement (Second) of Torts (1965) §§ 409–429. However, defendant has not cited and the Court has not found a single decision applying § 409 where, as here, the danger was open and obvious and the vessel owner had knowledge of the dangerous conditions responsible for the longshoreman's injury. *Compare Hurst v. Triad Shipping Co.,* 554 F.2d 1237 (3rd Cir. 1977) *and Munoz v. Flota Merchante Grancolombiana,* 553 F.2d 837 (2d Cir. 1977) *with Ruffino v. Scindia Steam Navigation Co.,* 559 F.2d 861 at 862 (2d Cir. filed July 18, 1977); *Anuszewski v. Dynamic Mariners Corp., Panama,* 391 F.Supp. 1143 (D.Md.1975), *aff'd,* 540 F.2d 757 (4th Cir. 1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); *Croshaw v. Koninklijke Nedlloyd, B. V. Rijswijk,* 398 F.Supp. 1224 (D.Or.1975); *Frasca v. Prudential-Grace Lines, Inc.,* 394 F.Supp. 1092 (D.Md.1975). In short, the decisions which have relied on § 409 are not apposite. Moreover, the rule stated in § 409 has been so eroded by exceptions that its validity is questionable; *see* Restatement (Second) § 409, comment *b*; W. L. Prosser, § 71, at 468, Handbook of the Law of Torts (4th ed. 1971), and at least one commentator has suggested there is a trend toward finding that mere relinquishment of control is not conclusive on the issue of the landowner's duty. *The Injured Longshoreman, supra* note 3, at 789.

Assuming *arguendo* that Congress intended real property concepts of tort law to govern, there is substantial authority that the applicable standard is the business invitee standard enunciated in Restatement §§ 343 and 343A. For example, at least three circuits and a number of district courts within the Ninth Circuit have now adopted the business invitee standard.[5] Section 343 of the Restatement provides:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land, if but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

Subsection (b) of Section 343 is qualified by Section 343A(1) which states:

A possessor of land is not liable to his invitees for physical harm caused to them by any activity on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.* (Emphasis added)

Read collectively, these sections postulate that mere obviousness of a danger does not necessarily absolve the premises occupier from liability. Analogizing the shipowner to a land-based premises occupier and applying the business invitee standard requires the Court to consider not only plaintiff's perception and appreciation of the hazard but also the shipowner's basis for expecting the arriving longshoreman will fail to protect himself and proceed to encounter the known hazard. Hence, it is critical (1) that plaintiff who had not had time to appreciate the full extent of the hazard and who had not been apprised by defendant or anyone else of the existence of the "non-skid" passage had no apparent alternative to traversing the chaff covered deck other than to abandon the opportunity for employment and (2) that defendant because of its own failure to inform the arriving longshoremen of the location of the safe path, had substantial reason to expect plaintiff to make precisely the choice he did.

Under these circumstances the trend of recent decisions indicates a longshoreman has no obligation to forego employment opportunity in order to avert a known hazard and the vessel owner is subject to a duty to take corrective action. The Second Circuit, for example, reversing a verdict for the defendant in *Napoli v. [Transpacific Carriers, etc.] Hellenic Lines* held it had been erroneous to charge the jury that mere obviousness of the danger relieves the vessel owner of any obligation to remedy the danger and remanded because of evidence that plaintiff's "only alternatives would have been to leave his job or face trouble for delaying the work."[6] In *Frasca v. Prudential-Grace Lines, Inc.*[7] the District Court addressed the issue of whether the vessel owner therein should have foreseen that plaintiff longshoreman would persist for seven hours using a ladder which he knew to have its handgrips covered with oil. Explicitly contrasting the situation in which a longshoreman repeatedly proceeds to en-

---

**5.** *Brown v. Mitsubishi Shintaku Ginko,* 550 F.2d 331 (5th Cir. 1977); *Gay v. Ocean Transport & Trading, Ltd.,* 546 F.2d 1233 (5th Cir. 1977); *Napoli v. [Transpacific Carriers, etc.] Hellenic Lines, Ltd.,* 536 F.2d 505 (2d Cir. 1976); *Anuszewski v. Dynamic Mariners Corp., Panama,* 391 F.Supp. 1143 (D.Md.1975), *aff'd,* 540 F.2d 757 (4th Cir. 1976), *cert. denied,* 429 U.S. 1098, 97 S.Ct. 1116, 51 L.Ed.2d 545 (1977); *Santos v. Scindia Steam Navigation Co.,* 1976 A.M.C. 2583 (W.D.Wash.1976); *Cro-shaw v. Koninklijke Nedlloyd, B. V. Rijswijk,* 398 F.Supp. 1224 (D.Or.1975); *c.f. Ramirez v. Toko Kaiun K. K.,* 385 F.Supp. 644 (N.D.Cal. 1974) (Orrick, J.). *But see Gallardo v. Westfal-Larsen & Co. A/S,* C76–040, 435 F.Supp. 484 (N.D.Cal. filed June 3, 1977) (Orrick, J., rejecting §§ 343–343A standard).

**6.** 536 F.2d 505, 507–509 (2d Cir. 1976).

**7.** 394 F.Supp. 1092 (D.Md.1975).

counter a known hazard over a prolonged period with the situation in which the casualty occurs at the beginning of the work day, the Court stated:

> Clearly, if the accident had occurred in the early morning upon the first descent down the hatch, a jury could find the shipowner liable.[8]

Also instructive are two Fifth Circuit decisions, *Brown v. Mitsubishi Shintaku Ginko*[9] and *Gay v. Ocean Transport & Trading, Ltd.*[10] which in applying § 343A recognized that the bar of the open and obvious danger rule is operative only if the plaintiff had a reasonable, perceptible alternative. Although each affirmed a judgment for defendant, each was careful to point out that the cause of injury was " 'not the type of danger which must be faced notwithstanding knowledge.' "[11]

According to the principles of §§ 343 and 343A, as illumined by the aforementioned authorities, defendant had a duty to take precautions for the protection of the arriving longshoremen because defendant had actual knowledge of the hazardous deck conditions and because plaintiff's only apparent means of reaching his work station was to traverse the chaff covered deck. As previously stated, defendant could have discharged this duty in various ways. Instead it made no effort to minimize the risk, and the foreseeable casualty occurred. Therefore, the land-based standards which defendant argues are applicable lead to a determination that defendant was negligent.

There are, however, more compelling reasons for imposing liability herein. The reasons relate both to the premises underlying the business invitee standard and to the legislative intent in enacting the 1972 Amendments. First, the standards expressed in Restatement §§ 343 and 343A incorporate the common law defense of assumption of risk. Restatement (Second) of Torts (1965) § 496C, comment *d*; *Id.* § 343A, comment *e*.[12] In this respect standard clearly contravenes the legislative intent of the Amendments, for while the legislative purpose may in some respects be ambiguous, the intent to prohibit the assumption of risk defense in actions by longshoremen is unequivocal. Using identical language, the House and Senate Committee Reports accompanying the 1972 Amendments state: "[T]he admiralty rule which precludes the defense of 'assumption of risk' in an action by an injured employee shall . . . be applicable."[13] Also manifest is the Congressional intent to pro-

---

**8.** *Id.* at 1101.

**9.** 550 F.2d 331 (5th Cir. 1977).

**10.** 546 F.2d 1233 (5th Cir. 1977).

**11.** *Brown v. Mitsubishi Shintaku Ginko,* 550 F.2d at 334; *Gay v. Ocean Transport & Trading, Ltd.,* 546 F.2d at 1242. Likewise both Dean Prosser's treatise on the law of torts and the Restatement (Second) posit with respect to open an obvious hazard that an employee has no obligation to forego employment opportunity in order to avert a known risk. Prosser, *supra* note 4, § 61, at 394–395; Restatement § 343A, comment *f*. Both authorities identify situations when the premises owner should anticipate the invitee will encounter harm and therefore has a duty to take remedial action. Remarkably on point, those examples ineluctably suggest fault on the part of defendant. Prosser states there is *usually* no obligation to protect an invitee against hazards of which he is aware, *but* liability should be imposed on the premises owner when, for instance, a workman falls as he is attempting to traverse steps he knows to be icy because the premises are held open to him for his use and therefore the premises owner should expect the invitee to encounter the hazard. Prosser, *supra* note 4, § 61, at 394–95. Similarly the comments following Restatement § 343A indicate that an employee who must cross a visibly slippery, waxed stairway in order to enter her place of employment inside the building and who is injured while trying to do so, is entitled to recover from the owner of the building. Restatement (Second) of Torts (1965) § 343A, comment *f*, illustration 5.

**12.** *See also Gallardo v. Westfal-Larsen & Co. A/S,* 435 F.Supp. 484 at 494 (N.D.Cal.1977); *The Injured Longshoreman, supra* note 3 at 781.

**13.** H.R.Rep. No. 92–1441, 92d Cong., 2d Sess. (1972), *reprinted in* 3 U.S.Cong. & Adm.News 4698, 4705 (1972); S.Rep. No. 92–1125, 92d Cong., 2d Sess. 12 (1972).

mote safety in the longshoring industry.[14] A conceptual framework predicated on assumption of risk focuses on plaintiff's perceptions rather than on the reasonableness of defendant's conduct.[15] To the degree that a standard of care incorporates the defense of assumption of risk, it ignores the reasonableness of defendant's conduct and makes the plaintiff's perceptions dispositive of the issue of whether defendant had a duty of care, or, alternatively, whether plaintiff's knowledge exculpated defendant from any such duty and thereby conflicts with the legislative intent to create safety incentives. Moreover, the Committee Reports explicitly reject contributory negligence as a bar and mandate a comparative negligence standard.[16] A conceptual approach predicated on assumption of risk is also fundamentally inconsistent with comparative negligence.

There are other respects in which the standards proposed by defendant conflict with statutory purposes explicit in the legislative history and are therefore inappropriate. The standards proposed by defendant are derived from real property concepts which presuppose that the duty of care should vary according to the visitor's status, as determined by certain common law distinctions, and that visitors entering upon the land are well able to fend for themselves.[17] Although there are a number of references to land-based principles in the legislative history which have frequently been equated with a mandate to espouse rules based upon real property concepts of tort law,[18] it should be recognized that such an interpretation is problematic at best. The Committee Reports do not use such terms as "real property" or "business invitee," [19] which suggests there was no intent to import into § 905(b) either common law distinctions between classes of visitors or the assumption that visitors to the premises are well situated to protect themselves from hazards thereon. In addition, while the legislative history unambiguously requires that the negligence remedy be a federally uniform one,[20] it merely alludes to land-based principles generally, not citing any particular area or doctrine of land-based law as being applicable, and does not refer either to the Restatement or to any

---

**14.** Both Reports expressly refer to the "objective of encouraging safety." H.R.Rep. at 4704; S.Rep. at 10. The Senate Report characterized longshoring as a "high-risk occupation" and noted the injury rate was more than four times the average for manufacturing operations. S.Rep. at 2. Each Committee considered and rejected legislation supported by both shipowners and stevedores that would have treated the vessel as a joint employer, subject only to the obligation to pay scheduled benefits and shielded from any liability in damages for negligence, H.R.Rep. at 4702; S.Rep. at 8, and each emphasized that "nothing in [the Amendments] is intended to relieve any vessels . . . from *their obligations and duties under the Occupational Safety and Health Act of 1970.*" H.R. Rep. at 4705; S.Rep. at 12. For additional evidence of the Congressional intent to promote safety, see text accompanying note 27 *infra. See generally* Robertson, *Negligence Actions by Longshoremen, supra* note 3, at 471.

**15.** *Gallardo v. Westfal-Larsen & Co. A/S,* 435 F.Supp. 484 at 494 (N.D.Cal.1977); *The Injured Longshoreman, supra* note 3, at 771.

**16.** H.R.Rep. at 4705; S.Rep. at 12.

**17.** *See Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 630–631, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); Robertson,

*Negligence Actions by Longshoremen, supra* note 3, at 451.

**18.** *See, e. g., Hurst v. Triad Shipping Co.,* 554 F.2d 1237, 1248 (3rd Cir. 1977); *Gay v. Ocean Transport Ltd.,* 546 F.2d 1233 (5th Cir. 1977); *Anuszewski v. Dynamic Mariners Corp., Panama,* 540 F.2d 757, 759 (4th Cir. 1976), aff'g., 391 F.Supp. 1143 (D.Md.1975); *Napoli v. [Transpacific Carriers, etc.] Hellenic Lines, Ltd.,* 536 F.2d 505 (2d Cir. 1976); *Hite v. Maritime Overseas Corp.,* 380 F.Supp. 222, 225–226, (E.D.Tex. 1974); *Lucas v. "Brinknes" Schiffahrts Ges.,* 379 F.Supp. 759, 767 (E.D.Pa.1974) (specially convened three-judge court).

**19.** *Gallardo v. Westfal-Larsen & Co. A/S,* 435 F.Supp. 484 at 492 (N.D.Cal.1977).

**20.** The pertinent section of each Report states:

[T]he Committee does not intend that the negligence remedy authorized in the bill shall be applied differently in different ports depending on the law of the State in which the port may be located. The Committee intends that legal questions which may arise in actions brought under these provisions of the law shall be determined as a matter of Federal law. H.R.Rep. at 4705; S.Rep. at 12.

other recognized source of negligence principles that would assist in determining from where or from what a uniform negligence standard is to be gleaned.

A land occupier's duty, whether defined in terms of the business invitee standard or in terms of the common law tenet that one who uses the services of an independent contractor is exonerated from liability to the employees of said contractor after relinquishing control of the premises, is narrow in scope. It thereby tends to conflict with the announced purpose to create safety incentives. Significantly both Committee Reports contain an example concerning the vessel's responsibility for cleaning up an oil spill which indicates the vessel's duty of care is more extensive than that required by real property concepts of tort law and similar to that required by traditional maritime standards. The given example is as follows:

> [W]here a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments . . . would still permit an action against the vessel for negligence. To recover he must establish that: (1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or (2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances.[21]

All of the foregoing objections to wholesale incorporation of real property concepts of tort liability can be viewed as indicating that the 1972 Amendments retained the maritime standard of reasonable care enunciated in *Kermarec v. Compagnie Generale Transatlantique.*[22] A number of affirmative reasons for concluding historic maritime principles should govern can also be found. For instance, it is a fundamental rule of statutory construction that the language of a statute is the most persuasive evidence of statutory intent. Nothing in the wording of the 1972 Amendments suggests any Congressional imprimatur on real property concepts of tort law or any intent to jettison the principles which governed longshoremen's negligence actions prior to 1972. Secondly, the longshoreman's cause of action is essentially maritime.[23] Furthermore, reliance on traditional maritime principles is consistent with and effectively implements a number of clearly expressed statutory purposes. Maritime tort law is inherently federal and uniform.[24] The prohibition of assumption of risk as a defense accords with the traditional admiralty rule.[25] Comparative negligence has been an integral part of maritime law for decades.[26] Perhaps most important, requiring the vessel owner to exercise reasonable care fulfills the legislative purpose to create safety incentives and the explicit mandate that "nothing in . . . [the Amendments] is intended to derogate from the vessel's responsibility to take appropriate corrective action where it knows or should have known about a dangerous condition."[27]

Applying the traditional maritime standard of care, plaintiff would clearly be entitled to prevail on the basis that defendant, as vessel owner, had a duty to exercise reasonable care which it breached by failing

21. H.R.Rep. at 4704; S.Rep. at 10–11.

22. 358 U.S. 625, 632, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959).

23. *See Southern Pacific Co. v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917); *Atlantic Transport Co. v. Imbrovek,* 234 U.S. 52, 34 S.Ct. 733, 58 L.Ed. 1208 (1914); Sheak, *supra* note 3, at 260.

24. *Southern Pacific v. Jensen,* 244 U.S. 205, 37 S.Ct. 524, 61 L.Ed. 1086 (1917).

25. *Socony-Vacuum Oil Co. v. Smith,* 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939); *The Arizona v. Anelich,* 298 U.S. 110, 56 S.Ct. 707, 80 L.Ed. 1075 (1936).

26. *Pope & Talbot, Inc. v. Hawn,* 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143 (1953); *Socony-Vacuum Oil Co. v. Smith,* 305 U.S. 424, 59 S.Ct. 262, 83 L.Ed. 265 (1939).

27. H.R.Rep. at 4704; S.Rep. at 10.

to apprise plaintiff of the "non-skid" walkway or to correct the hazardous condition.[28]

■ Notwithstanding the analytic harmony between a purely maritime standard and many of the expressed Congressional objectives, it is apparent that such a standard is not consistent with all of the objectives. The argument that § 905(b) did not change the scope of the vessel owner's duty is tenable only by ignoring the legislative history altogether or by attempting to explain away the references to land-based standards. There are at least six separate references to land-based standards in each of the Committee Reports.[29] Some but not all of these references can be interpreted as merely intending to emphasize the difference between the negligence remedy, which requires proof of fault on the part of the vessel owner, and the unseaworthiness remedy, which does not. Illustrative of the statements in the legislative history which suggest that the reference to land-based standards was intended to have affirmative significance for the substantive content of the negligence standard is the following:

> The Committee intends that on the one hand an employee injured on board a vessel shall be in no less favorable position vis-a-vis his rights against the vessel . . . than is an employee who is injured on land, and on the other hand, that the vessel shall not be liable . . unless it is proven to have acted or have failed to act in a negligent manner such as would render a land-based third party in non-maritime pursuits liable under similar circumstances.[30]

Furthermore, there has been only a single reported decision adjudicating a vessel's liability which has held that the numerous references to land-based principles had no substantive significance concerning the scope of the vessel's duty of care, and that decision has been overruled.[31] Virtually all other such decisions have assumed or concluded that the references in the legislative history to land-based concepts have *some* affirmative implications with respect to the applicable standard of care. It should also be noted that the 1972 Amendments were a creature of compromise, born of Congressional effort to reconcile the conflicting interests of three powerful factions—the longshoremen, the stevedores and the shipping industry—and there is some authority that in return for abolishing the vessel owner's right of indemnification against the stevedore, Congress intended to limit the longshoreman's right to recover against the vessel to instances where he could show the vessel had breached a relatively strict standard of care.[32] Moreover, a purely maritime standard, i. e., one affording a relatively broad negligence remedy, would do little to deter a large number of third party actions by longshoremen and consequently is incompatible with the expressed concern of Congress about the drain on judicial resources caused by such suits.[33]

Thus neither wholesale adoption of real property concepts of tort liability (such as the business invitee standard) nor unmodified retention of the pre-1972 scope of the vessel owner's duties (including for instance, the duty of supervision and the duty to discover dangerous conditions created by the stevedore after stevedoring operations have begun) seem consistent with all of the legislative guidelines. Congress has indicated the elements of the standard but delegated to the courts the task of defining it by identifying the interrelationship of the

---

28. *Kermarec v. Compagnie Generale Transatlantique,* 358 U.S. 625, 632, 79 S.Ct. 406, 3 L.Ed.2d 550 (1959); *Johnson Line v. Maloney,* 243 F.2d 293, 294 (9th Cir. 1957).

29. H.R.Rep. at 4702–4704; S.Rep. at 8–12.

30. H.R.Rep. at 4704; S.Rep. at 11.

31. *Marant v. Farrell Lines,* 1976 A.M.C. 504 (E.D.Pa.1976), *rev'd,* 550 F.2d 142 (3rd Cir. 1977).

32. *See Lucas v. "Brinknes" Schiffahrts Ges.,* 379 F.Supp. 767 (E.D.Pa.1974) (specially convened three-judge court); *Hite v. Maritime Overseas Corp.,* 380 F.Supp. 222, 225 (E.D.Tex. 1974).

33. H.R.Rep. at 4702–4703; S.Rep. at 9.

elements. A fair reading of the legislative history as a whole suggests that the compromise nature of the enactment and the references to land-based standards require recognition that the vessel's duty of care is narrower in scope than was the situation prior to the Amendments, yet the legislative history also reflects cognizance of the exceptional hazards of the longshoring industry and emphasizes the need to improve waterfront safety. As a result there is at least a potential tension among the statutory purposes relating to the scope of the negligence remedy.

A means of reconciling the various legislative objectives was recently advanced in *Gallardo v. Westfal-Larsen & Co. A/S.*[34] The *Gallardo* Court suggested that Congress had indicated seven different guidelines or considerations and that the negligence standard governing post-Amendment actions must accommodate each of the seven. Included among them were uniformity, safety, "the need to place the injured longshoreman in the same position as an employee injured on land," "the need to resort to land-based standards of negligence," and the "need to retain the admiralty concept of negligence."[35] Judge Orrick, in a comprehensive and scholarly analysis modified the oft-cited standard of care which he had articulated in *Ramirez v. Toko Kaiun K.K.*[36] and formulated a new standard consistent with each of the Congressional considerations enumerated by him:

> Before the commencement of stevedoring operations, the owner of a vessel in navigable waters has a duty to take reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual or constructive knowledge. After the commencement of stevedoring operations, the owner of a vessel in navigable waters has a duty to take reasonable remedial action with respect to all unreasonably dangerous conditions of which it has actual knowledge.[37]

Although it suffices for present purposes to note that *Gallardo* discards the open and obvious danger rule, and that both *Gallardo* and the related decision of *Darwin v. United States,*[38] would mandate liability herein, I would add that Judge Orrick's decisions have provided a valuable aid in navigating between the Scylla and Charybdis of opposing interpretations of the 1972 Amendments.

In conclusion, I am of the opinion that by any authoritatively applicable standard, defendant is liable and I so find. Hence the sole question remaining is whether plaintiff was contributorily negligent. The evidence presented shows that plaintiff was proceeding from the gangway slowly and cautiously, and there is no indication that he acted unreasonably.

The issue of damages has been bifurcated. If the parties are unable to agree on damages within 30 days from the date hereof, the Court will upon motion set the matter for hearing before the Court or a special master.

---

**34.** 435 F.Supp. 484 (N.D.Cal.1977).

**35.** *Id.* at 10.

**36.** 385 F.Supp. 644, 646 (N.D.Cal.1974).

**37.** *Gallardo v. Westfal-Larsen & Co. A/S,* 435 F.Supp. 484 at 490 (N.D.Cal.1977).

**38.** 435 F.Supp. 501 (N.D.Cal.1977).