**Lauro De Los SANTOS, Appellant,**

**v.**

**SCINDIA STEAM NAVIGATION CO., LTD., Appellee,**

Seattle Stevedore Co., Intervenor.

No. 76–3225.

United States Court of Appeals, Ninth Circuit.

May 1, 1979.

Rehearing Denied June 28, 1979.

---

James A. Grutz (argued), Seattle, Wash., for appellant.

Robert H. Madden (argued), Seattle, Wash., for appellee.

Before DUNIWAY and CHOY, Circuit Judges, and GRANT,* District Judge.

* The Honorable Robert A. Grant, Senior United States District Judge for the Northern District of Indiana, sitting by designation.

DUNIWAY, Circuit Judge:

Several 50 pound sacks of grain tumbled off a pallet, severely injuring appellant longshoreman Lauro De Los Santos, who was working in a ship's hold. Santos sued appellee shipowner Scindia Steam Navigation Co. ("Scindia"), alleging that the accident had occurred because the shipowner had negligently failed to repair the winch by means of which the pallet was lowered into the hold. The district court granted the shipowner's motion for summary judgment. Its opinion is reported at 1976 A.M.C. 2583. We reverse.

## I. The Facts.

Stated in the light most favorable to Santos, against whom summary judgment was granted, the facts are these:

On the evening of December 10, 1972, Santos and other longshoremen employed by the Seattle Stevedoring Company were loading a cargo of wheat into a hold in Scindia's vessel, the M/S JALARATNA. The longshoremen used a winch that was part of the ship's gear to lower wooden pallets, each carrying seventy fifty-pound sacks of wheat, into the hold.

The ship's winch was unusual in that its controls were located on a platform more than 25 feet above the main deck. From that point, the winch driver could not actually see a pallet of sacks as he lowered it into the hold. He thus had to rely upon the hatch tender to signal to him when to start and stop the winch. Santos and three other men were in the hold. When a pallet reached the bottom of the hold, Santos and his co-workers would stow the sacks. Seattle Stevedoring controlled the loading procedure.

The winch's braking mechanism had continually malfunctioned during the two days prior to the accident and on the day of the accident in that, when the winch driver tried to stop a load, the load continued to fall for several feet before coming to a stop. The winch continued malfunctioning on the night of the accident. As the winch driver lowered the loaded pallet into the hold, the hatch tender signaled him to stop its descent. The winch driver applied the brake, but the pallet kept falling. When it struck a pallet jack, on which it should have come to rest, about half the sacks spilled off the pallet.

The hatch tender then had the winch driver raise the pallet, carrying the remaining sacks in a loose pile and not fastened down, about fifteen feet up so that Santos and the other men could clean up the spilled sacks. After the winch driver had raised the pallet, the hatch tender looked over the remaining sacks. He thought that they looked stable enough that he concluded that no more sacks would spill off and endanger the men cleaning-up below. Nevertheless, about ten minutes later several more sacks fell off the pallet and landed on Santos.

The parties disagree about what caused those sacks to work loose and fall. The district court accepted the shipowner's position that the pallet had swung back and forth, and that this swinging loosened the sacks. Santos points to deposition testimony which indicates little if any swinging. He relies upon testimony tracing the accident to further malfunctioning of the winch's braking mechanism. The winch driver explained that even though he had the controls set to hold the pallet stationary, the pallet began slipping down into the hold three or four times during the ten minutes, requiring him to pull it back up again each time so that it would not interfere with the cleanup. Santos argues that the defective condition of the ship's winch caused the repeated slipping, and that this slipping and pulling back up caused the additional sacks to work loose and fall.

## II. The Applicable Law.

The Longshoremen's and Harbor Workers' Compensation Act defines the rights of longshoremen injured while taking part in stevedoring operations. Just before Santos' accident, Congress had passed the Longshoremen's and Harbor Workers' Compensation Act Amendments of 1972, Pub.L. 92–576, 86 Stat. 1251, amending 33 U.S.C. §§ 901–950. The Amendments made

sweeping changes in the legal relationships among injured longshoremen, stevedores, and shipowners. Before the Amendments, an injured longshoreman could sue a shipowner for negligence, and also for breach of a warranty of seaworthiness, a form of liability without fault. *Seas Shipping Co., Inc. v. Sieracki,* 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099. If the longshoreman could establish that he had been injured by unsafe conditions aboard the ship, he recovered even if the shipowner had not been negligent. Under *Ryan Stevedoring Co. v. Pan-Atlantic S.S. Co.,* 1956, 350 U.S. 124, 76 S.Ct. 232, 100 L.Ed. 133, the vessel owner could in turn seek indemnity against the stevedore company when a substandard performance by the stevedore or its longshoremen had brought the unseaworthy conditions into play. The injured longshoreman could not sue the stevedore, but he was entitled to workers' compensation type benefits without regard to fault.

Under the 1972 Amendments, the injured longshoreman lost his action against the shipowner for unseaworthiness, but in return Congress granted the longshoreman significantly higher compensation benefits. Congress also ended the shipowner's right to indemnity from the stevedore. The shipowner had less need for indemnification because the abolition of the unseaworthiness action left it liable only when an injured longshoreman could prove it negligent. House Report No. 92–1441, 92d Cong., 2d Sess., reprinted in 1972 U.S.Code Cong. and Admin.News, pp. 4698–4705; Senate Report No. 92–1125, 92d Cong., 2d Sess., pp. 8–12; *Davison v. Pacific Inland Nav. Co., Inc.,* 9 Cir., 1978, 569 F.2d 507, 511–13. *Note,* "The Injured Longshoreman v. The Shipowner After 1972: Business Invitees, Land-Based Standards, and Assumption of Risk," 28 *Hastings L.J.* 771, 773–79 (1977). [hereafter, "The Injured Longshoreman"] *Cooper Stevedoring Co. v. Kopke, Inc.,* 1974, 417 U.S. 106, 113, fn. 6, 94 S.Ct. 2174, 40 L.Ed.2d 694.

The Act as amended explicitly preserves the injured longshoreman's right to sue the shipowner for negligence. 33 U.S.C. § 905(b) provides that:

In the event of injury to a person covered under this chapter caused by the negligence of a vessel, then such person . . may bring an action against such vessel as a third party . . . .. The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred. . . .

In the case at bar, Santos alleged that Scindia had been negligent within the meaning of § 905(b), and that Scindia's negligence had proximately caused his injuries. He timely asserted his right to have the facts tried to a jury.

■ When a party moves for summary judgment under Fed.R.Civ.P. 56, all of the facts and all reasonable inferences to be drawn from those facts must be viewed in the light most favorable to the party against whom the motion is made. The trial court may grant the motion for summary judgment only when no material questions of fact remain. *Poller v. Columbia Broadcasting Systems, Inc.,* 1962, 368 U.S. 464, 467, 82 S.Ct. 486, 7 L.Ed.2d 458; *United States v. Diebold, Inc.,* 1962, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176; *United States v. Perry,* 9 Cir., 1970, 431 F.2d 1020, 1022; *Radobenko v. Automated Equipment Corporation,* 9 Cir., 1975, 520 F.2d 540, 543; *United States v. Bissett-Berman Corporation,* 9 Cir., 1973, 481 F.2d 764, 767. Furthermore, we have emphasized that " '[i]ssues of negligence are ordinarily not susceptible of summary adjudication.' " *Arney v. United States,* 9 Cir., 1973, 479 F.2d 653, 660. *See also, Leaf v. United States,* 9 Cir., 1978, 588 F.2d 733, 736.

Here, Santos contends that the district court granted the motion for summary judgment only after resolving a number of disputed material facts against him. Santos also argues that the district court applied an incorrect legal standard when it explicitly adopted the standard of negligence set forth in Restatement (Second) of Torts, §§ 343 and 343A. To pass upon these contentions, we must begin by determining what showing of negligence § 905(b) re-

quires when an allegedly dangerous condition of the ship or its gear injures a longshoreman.[1]

The Act does not define "negligence." *Davis v. Inca Compania Naviera, S.A.,* W.D. Wash., 1977, 440 F.Supp. 448, 451; *Gallardo v. Westfal-Larsen & Co. A/S,* N.D.Cal., 1977, 435 F.Supp. 484, 492. In *Davison v. Pacific Inland Navigation Co., Inc.,* 9 Cir., 1978, 569 F.2d 507, 508–09, fn. 1, we specifically reserved the question of what standard of negligence is to be used in a case brought under the Act. We noted there that courts which have already considered the question have applied different standards. Santos' appeal requires us to arrive at a standard.

While the legislative history is not entirely clear, we read the House and Senate Committee Reports, cited *supra,* as calling upon the federal courts to fashion a negligence standard responsive to five specific concerns. *Cf. Gallardo v. Westfal-Larsen & Co. A/S, supra,* 435 F.Supp. at 491, 493.

First, Congress was concerned about safety. The Senate Committee on Labor and Public Welfare protested that longshoring had an injury frequency rate "well over four times the average for manufacturing operations," and called for safer working conditions when it insisted that "every appropriate means be applied toward improving the tragic and intolerable conditions which take such a heavy toll upon workers' lives and bodies. . . ." Senate Report at 2. The Amendments sought to strengthen economic incentives "to provide the fullest measure of on-the-job safety." House Report at 4699. The higher compensation benefits were meant to "assure that the employer bears the cost of unsafe conditions." Senate Report at 2. "Permitting actions against the vessel based on negligence" was meant to "meet the objective of encouraging safety." House Report at 4704. *Samuels v. Empresa Lineas Maritimas Argentinas,* 5 Cir., 1978, 573 F.2d 884,

888 ("promotion of shipboard safety . . a primary focus" of the negligence action); *Marant v. Farrel Lines, Inc.,* 3 Cir., 1977, 550 F.2d 142, 149, fn. 3 (concurring opinion); *Davis v. Inca Compania Naviera, S.A.,* W.D. Wash., 1977, 440 F.Supp. 448, 454, fn. 14. "Congress was concerned that the vessel owner not become lax in doing what it should reasonably be required to do to prevent injuries to the longshoremen." *Lucas v. "Brinknes" Schiffahrts Ges,* E.D.Pa., 1974, 379 F.Supp. 759, 769 (three-judge court).

Second, to assure uniformity Congress specified that it "intend[ed] that legal questions . . . be determined as a matter of Federal law." House Report at 4705. In *Wescott v. Impresas Armadoras, S.A. Panama,* 9 Cir., 1977, 564 F.2d 875, 882, we held that federal law continues to govern lawsuits between an injured longshoreman and a shipowner. *See also, Brown v. Ivarans Rederi A/S,* 3 Cir., 1976, 545 F.2d 854, 861–63; *Cox v. Flota Mercante Grancolombiana S.A.,* 2 Cir., 1978, 577 F.2d 798, 800–801, fn. 1; *Birrer v. Flota Mercante Grancolombiana,* D.Ore., 1974, 386 F.Supp. 1105.

Third, Congress wanted to make certain that it had really done away with longshoremen's actions based upon unseaworthiness. Concerned that some courts might continue holding vessels strictly liable for unsafe conditions by simply relabeling unseaworthiness "negligence," Congress emphasized that it intended the courts to define "negligence" in accordance with the land-based traditions of not imposing liability without regard to actual fault. *Gallardo, supra,* 435 F.Supp. at 492; *Giacona v. Capricorn Shipping Co.,* S.D.Tex., 1975, 394 F.Supp. 1189, 1192–194; *The Injured Longshoreman, supra,* at 778–79; *Lucas v. "Brinknes" Schiffahrts Ges, supra,* 379 F.Supp. at 767–68, 771–72. The Committee thus reported that they had "rejected the thesis that a vessel should be liable without

---

1. In *Wescott v. Impresas Armadoras, S.A. Panama,* 9 Cir., 1977, 564 F.2d 875, 883, we quoted *Hurst v. Triad Shipping Co.,* 3 Cir., 1977, 554 F.2d 1237, 1251, 1252, for the proposition that a vessel owner owes no duty to protect long-

shoremen against defects in the equipment the longshoremen and stevedore bring aboard. In this case, it is undisputed that the winch was part of the ship and thus provided for use by the vessel owner.

regard to its fault." Senate Report at 8. House Report at 4702. Rather, Congress concluded that,

> it would be fairer to all concerned and fully consistent with the objective of protecting the health and safety of employees who work on board vessels for the liability of vessels as third parties to be predicated on negligence, rather than the no-fault concept of seaworthiness. This would place vessels in the same position, insofar as third party liability is concerned, as land-based third parties in non-maritime pursuits.

> The purpose of the amendments is to place an employee injured aboard a vessel in the same position he would be if he were injured in non-maritime employment ashore, insofar as bringing a third party damage action is concerned, and not to endow him with any special maritime theory of liability or cause of action under whatever judicial nomenclature it may be called, such as "unseaworthiness", "non-delegable duty", or the like. House Report at 4703. Senate Report at 10.

■ Under the former law, some unsafe conditions which supported an unseaworthiness action might also have supported a negligence action. Because of the overlap between the two doctrines, Congress feared that its abolition of the unseaworthiness action might lead some post-Amendment courts to conclude that if a set of facts would have amounted to unseaworthiness, Congress meant to preclude a recovery based upon negligence. After collecting a number of cases to illustrate situations in which the unseaworthiness doctrine would no longer apply, the Committees carefully cautioned that their listing of disapproved cases was "not intended to reflect a judgment as to whether recovery on a particular factual setting could have been predicated on the vessel's negligence." Senate Report at 10. House Report at 4703–4704. Thus, consistent with Congress' intention to apply the land-based traditions of no liability without regard to fault, it is perfectly possible under the new law for an unseaworthy condition to give rise to a negligence recovery when a vessel fails "to take appropriate corrective action where it knows or should have known about a dangerous condition." House Report at 4704, Senate Report at 10; *Solsvik v. Maremar Compania Naviera, S.A.*, W.D.Wash., 1975, 399 F.Supp. 712, 715; *Slaughter v. Ronde*, S.D.Ga., 1974, 390 F.Supp. 637, 641, *aff'd per curiam*, 5 Cir., 1975, 509 F.2d 973.

■ Fourth, Congress "intend[ed] that the admiralty concept of comparative negligence, rather than the common law rule as to contributory negligence, shall apply in cases where the injured employee's own negligence may have contributed to causing the injury." House Report at 4705. Senate Report at 12. Thus, a longshoreman's carelessness reduces but does not necessarily bar his recovery. *Shellman v. United States Lines, Inc.*, 9 Cir., 1975, 528 F.2d 675, 676–77, fn. 1; *Anderson v. Iceland S.S. Co.*, D.Mass., 1977, 431 F.Supp. 869, 872.

Finally, Congress "intend[ed] that the admiralty rule which precludes the defense of 'assumption of risk' in an action by an injured employee shall also be applicable." House Report at 4705, Senate Report at 12. *Davis, supra*, 440 F.Supp. at 454.

### III. *The Applicable Standard.*

■ We adopt the following standard of negligence for purposes of 33 U.S.C. § 905(b) actions:

> A vessel is subject to liability for injuries to longshoremen working on or near the vessel caused by conditions on the vessel if, but only if, the shipowner

> (a) knows of, or by the exercise of reasonable care would discover, the condition, and should realize that it involves an unreasonable risk of harm to such longshoremen, and

> (b) the shipowner fails to exercise reasonable care under the circumstances to protect the longshoremen against the danger.

*See* House Report at 4704; Senate Report at 10–11.[2] *Cf. Anderson v. Iceland S.S. Co.,* .D.Mass., 1977, 431 F.Supp. 869, 873. We believe that the standard we adopt responds to all five of Congress' concerns. It will promote safety within a comparative negligence framework while avoiding both liability without fault and the defenses of contributory negligence and assumption of risk. *See Gallardo, supra,* 435 F.Supp. at 498.

In adopting the "reasonable care under the circumstances" standard, we are not unmindful of the fact that the Second, Fourth, and Fifth Circuits have defined "negligence" under § 905(b) in terms of a landowner's duty to invitees under Restatement (Second) of Torts, § 343 and § 343A.[3] *See Davison v. Pacific Island Navigation Co., Inc.,* 9 Cir., 1978, 569 F.2d 507, 508, n. 1.[4] We decline to follow the lead of those Circuits for three reasons.

First of all, § 343(b) and § 343A place limitations on a landowner's liability to an invitee inconsistent with Congress' explicit direction to reject common law rules of contributory negligence and assumption of risk in favor of applying the admiralty concept of comparative negligence.[5] We also

2. The cited Committee Reports illustrated how the negligence standard described by Congress would apply in an actual case:

So, for example, where a longshoreman slips on an oil spill on a vessel's deck and is injured, the proposed amendments to Section 5 would still permit an action against the vessel for negligence. To recover he must establish that: 1) the vessel put the foreign substance on the deck, or knew that it was there, and willfully or negligently failed to remove it; or 2) the foreign substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances. House Report at 4704; Senate Report at 10–11.

The structure of Congress' illustration supports the standard of negligence we adopt today.

3. These sections of the Restatement provide, in relevant part:

TITLE E. SPECIAL LIABILITY OF POSSESSORS OF LAND TO INVITEES
§ 343. Dangerous Conditions Known to or Discoverable by Possessor
A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
(c) fails to exercise reasonable care to protect them against the danger.
§ 343A. Known or Obvious Dangers
(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.

4. Cases adopting Restatement §§ 343 and 343A include *Canizzo v. Farrell Lines, Inc.,* 2 Cir., 1978, 579 F.2d 682, 684–85; *Samuels v. Empresa-Lineas Maritimas Argentinas,* 5 Cir., 1978, 573 F.2d 884, 885–86; *Wiles v. Delta Steamship Lines, Inc.,* 5 Cir., 1978, 574 F.2d 1339, 1340; *Lubrano v. Royal Netherlands Steamship Co.,* 2 Cir., 1978, 572 F.2d 364, 366; *Anuszewski v. Dynamic Mariners Corp., Panama,* 4 Cir., 1978, 540 F.2d 757, 758–59 *(per curiam),* aff'g, D.Md., 1975, 391 F.Supp. 1143; *Brown v. Mitsubishi Shintaku Ginko,* 5 Cir., 1977, 550 F.2d 331, 333–34; *Gay v. Ocean Transport & Trading, Ltd.,* 5 Cir., 1977, 546 F.2d 1233, 1238; *Napoli v. [Transpacific Carriers, Etc.] Hellenic Lines,* 2 Cir., 1976, 536 F.2d 505, 508–509; *Bovia v. S/S Agia Erini,* E.D.La., 1977, 433 F.Supp. 1020, 1022; *Croshaw v. Koninklijke Nedlloyd B.V. Rijswijk,* D.Ore., 1975, 398 F.Supp. 1224, 1229; *Frasca v. Prudential-Grace Lines, Inc.,* D.Md., 1975, 394 F.Supp. 1092, 1097–98, 1100–01; *Birrer v. Flota Mercante Grancolombiana,* D.Ore., 1974, 386 F.Supp. 1105, 1112. *Cf. Cox v. Flota Mercante Grancolombiana,* 2 Cir., 1978, 577 F.2d 798; *Ruffino v. Scindia Steam Navigation Co., Ltd.,* 2 Cir., 1977, 559 F.2d 861; *Castel v. Moller, A.P.,* N.D.Cal., 1977, 441 F.Supp. 851; *Hite v. Maritime Overseas Corporation,* E.D.Tex., 1974, 380 F.Supp. 222, 226–27.

5. The Comments explaining § 343(b) and § 343A(1) show that these limitations on liability are based upon the substance of the proscribed defenses of contributory negligence and assumption of risk. Section 343A, comment e, for example, explains that:

In the ordinary case, an invitee who enters land is entitled to nothing more than knowledge of the conditions and dangers he will encounter if he comes. If he knows the actual conditions, . . . and the dangers involved . . . ., he is free to make an intelligent choice as to whether the advantage to be gained is sufficient to justify him in incurring the risk by entering or remaining on the

fear that these limitations on liability would undercut Congress' intention to reduce the frequency of accidents by creating economic incentives to provide safer working conditions. *Davis, supra*, 440 F.Supp. at 454–55; D. Robertson, "Negligence Actions by Longshoremen Against Shipowners Under the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act," 7 *Journal of Maritime Law and Commerce* 447, 473.[6]

Secondly, the Supreme Court's decision in *Kermarec v. Compagnie General Transatlantique*, 1959, 358 U.S. 625, 630–32, 79 S.Ct. 406, 3 L.Ed.2d 550, supports our selection of a "reasonable care under the circumstances" approach. *Griffith v. Wheeling-Pittsburgh Steel Corp.*, N.D.Pa., 1978, 452 F.Supp. 841, 844. In *Kermarec*, the plaintiff had come on board defendant shipowner's vessel to pay a social visit to a crew member. As he was leaving, the plaintiff injured himself in a fall caused by a defective stairway runner. The plaintiff then sued the shipowner, alleging unseaworthiness and negligence.

Both the Supreme Court and the lower courts began by ruling out any recovery based upon unseaworthiness, just as we must rule out an unseaworthiness recovery under § 905(b). The lower courts then set aside the plaintiff's jury verdict based upon negligence on the ground that the plaintiff had been a mere licensee rather than an invitee. A unanimous Supreme Court reversed. Refusing to incorporate the common law of invitees into admiralty, the Court set forth its own negligence standard:

---

land. *The possessor of the land may reasonably assume that he will protect himself by the exercise of ordinary care,* [i. e., avoid contributory negligence] *or that he will voluntarily assume the risk of harm if he does not succeed in doing so.* Reasonable care on the part of the possessor therefore does not ordinarily require precautions, or even warning, against dangers which are known to the visitor, or so obvious to him that he may be expected to discover them.
(emphasis added)

In like fashion § 343, comment b limits the possessor's duty simply to putting the invitee in a position where the invitee "may decide intelligently whether or not to accept the invitation [to encounter the danger], or may protect himself against the danger if he does accept it." *See also*, § 343, comment d, § 343A, comment d, and § 496C, comment d. *Cf.* W. Prosser, *The Law of Torts*, Sec. 61, 394 (4th Ed., 1971).

The Restatement's standard of care incorporates the proscribed defenses into its definition of the possessor's duty when it allows the possessor to count on his invitees to discover conditions, realize their dangers, and then protect themselves against the dangers. To apply the limitations of § 343(b) and § 343A(1) to negligence suits under the Amendments would violate the legislative intent behind § 905(b) because it would, in substance if not in form, give defendant shipowners the benefits of a partial or absolute bar to liability having the characteristics of a defense based upon contributory negligence or implied assumption of risk or both. *Brown v. Ivarans Rederi A/S*, 3 Cir., 1976, 545 F.2d 854, 863–64, fn. 10; *Hurst v. Triad Shipping Co.*, 3 Cir., 1977, 554 F.2d 1237, 1250, fn. 35; *Davis, supra*, 440 F.Supp. at 453–55; *Gallardo, supra*, 435 F.Supp. at 494; *Espinoza v. United States Lines, Inc.*, S.D.N.Y., 1978, 444 F.Supp. 405, 410; *Shepler v. Weyerhaeuser Co.*, 1977, 279 Or. 477, 494–97, 369 P.2d 1040, 1050–051 (in banc); *The Injured Longshoreman, supra*, 28 Hastings L.J. 780–81; *cf. Gay v. Ocean Transport & Trading, Ltd.*, 5 Cir., 1977, 546 F.2d 1233, 1241–242.

From the point of view of an injured plaintiff, to use a definition of shipowner's duty which incorporates assumption of risk may well be worse than allowing the shipowner to plead assumption of risk as an affirmative defense. If assumption of risk came into play as an affirmative defense, the shipowner would have the burden of proving that the longshoreman assumed the risk. On the other hand, because the longshoreman has the burden of proving the shipowner's breach of duty, to incorporate absence of assumption of risk into the definition of duty would force the injured plaintiff to bear the burden of proving that he did not assume the risk. *See The Injured Longshoreman, supra*, 781, fn. 90.

**6.** In urging us to affirm the district court's application of Restatement §§ 343(b) and 343A, Scindia relies heavily upon Judge Orrick's use of the business invitee standard in *Ramirez v. Toko Kaium K.K.*, N.D.Cal., 1974, 385 F.Supp. 644. We note that in *Gallardo v. Westfal-Larsen & Co.*, N.D.Cal., 1977, 435 F.Supp. 484, and in *Darwin v. United States*, N.D.Cal., 1977, 435 F.Supp. 501, Judge Orrick explicitly modified his *Ramirez* approach to reject the use of the business invitee standard. In many respects, our approach follows Judge Orrick's thoughtful analysis in *Gallardo*.

the owner of a ship . . . owes to all who are on board for purposes not inimical to his legitimate interests the *duty of exercising reasonable care under the circumstances of each case.* 358 U.S. at 632, 79 S.Ct. at 410. (emphasis added)

The Court saw the common law moving toward " 'imposing . . . a single duty of reasonable care in all circumstances' " 358 U.S. 625, 79 S.Ct. 406, 3 L.Ed.2d 550. It then explained that the real property tort law of invitees had been

inherited from a culture deeply rooted to the land, a culture which traced many of its standards to a heritage of feudalism, 358 U.S. at 630, 79 S.Ct. at 410.

and that in an effort to adopt that law to do justice in a modern industrialized society,

common-law courts had found it necessary to . . . create . . . a semantic morass . . . [of] increasingly subtle verbal refinements, . . . subclassifications . . . [and] . . fine gradations in the standards of care. 358 U.S. at 630–31, 79 S.Ct. at 410.

Invoking the admiralty tradition of "simplicity and practicality," the Court decided to spare the federal courts from having to join in the "confusion and conflict" by simply adopting the better rule towards which the common law was evolving, albeit "unevenly and with hesitation."

The *Kermarec* reasoning applies just as fully today, *Espinoza v. United States Lines, Inc.*, S.D.N.Y., 1978, 444 F.Supp. 405, 413–14, especially in light of the fact that the trend in the law of invitees relied upon in *Kermarec* has continued. *See, e. g., Rowland v. Christian*, 1968, 69 Cal.2d 108, 70 Cal.Rptr. 97, 443 P.2d 561. As Judge Orrick put it in *Gallardo:*

[this] Court rejects resort to terminology which prevents inquiry into the reasonableness of conduct under the circumstances of a given case. Discussions relating to invitees, contractors, primary and second responsibilities, obviousness of dangers, and relinquishment of control all have the tendency to steer courts away from a balance of the risk of harm

against the utility of the particular conduct in question. 435 F.Supp. at 496. *Accord, Griffith v. Wheeling-Pittsburgh Steel Corp., supra,* 452 F.Supp. at 844.

Finally, because the legislative history of § 905(b) never refers to the Restatement and never used real property tort law terms such as "invitee," we feel confident that our adoption of a "reasonable care under the circumstances" approach is not an "impingement upon legislative policy." *Kermarec, supra,* 358 U.S. at 630, fn. 5, 79 S.Ct. 406. *Accord, Gallardo, supra,* 435 F.Supp. at 492, 496; *Espinoza, supra,* 444 F.Supp. at 413–14; *cf. Brown v. Ivarans Rederi, A/S,* 3 Cir., 1976, 545 F.2d 854, 863.

While *Davison v. Pacific Inland Navigation Co., Inc.*, 9 Cir., 1978, 569 F.2d 507, 508–09, fn. 1, left "for another day" the defining of negligence and duty, that case and our earlier decision in *Wescott v. Impresas Armadoras, S. A. Panama*, 9 Cir., 1977, 564 F.2d 875, are both consistent with the standard that we adopt. In each, we held that, under the circumstances, there was no evidence that the shipowner knew or should have known of the dangers involved. It is also possible to read those cases as holding that the negligence of the longshoremen or the stevedore or both was the sole proximate cause of the injury. We cannot conclude as a matter of law that that is so in the case at bar.

In adopting the "reasonable care under the circumstances" standard, we cannot accept the idea that an injured longshoreman cannot recover because he should have demanded that the stevedore halt further loading operations until the stevedore could arrange to improve the working conditions. We agree with those courts which recognize that longshoremen "face trouble for delaying work." *Napoli v. [Transpacific Carriers, Etc.] Hellenic Lines,* 2 Cir., 1976, 536 F.2d 505, 509; *Davis, supra,* 440 F.Supp. at 452; *Gay v. Ocean Transport & Trading, Ltd.,* 5 Cir., 1977, 546 F.2d 1233, 1241, fn. 17, *reaffirming, Brock v. Coral Drilling, Inc.,* 5 Cir., 1973, 477 F.2d 211, 215.

Under the rule of comparative negligence, the contributory negligence of an injured longshoreman reduces but does not preclude recovery. And in *Dodge v. Mitsui Shintaku Ginko KK Tokyo,* 9 Cir., 1975, 528 F.2d 669, and *Shellman v. United States Lines, Inc.,* 9 Cir., 1975, 528 F.2d 675, we held that "a longshoreman who has received injuries caused by the concurring negligence of his stevedore and the shipowner can recover the full amount of his damages from the shipowner." *Dodge, supra,* 528 F.2d at 673; *Shellman, supra,* 528 F.2d 679–81. Thus, the contributory negligence of the longshoreman's employer or fellow longshoremen will not preclude or diminish recovery through a theory of imputed contributory negligence. It is the longshoreman's own negligence that will reduce his recovery from the negligent vessel under the Amended Act.

### IV.  *The Standard Applied.*

Having determined the standard of care required of a shipowner subject to an injured longshoreman's third party action under § 905(b), we must reverse the district court's summary judgment dismissing Santos' action. The following district court "findings" decided reasonably disputable factual issues against Santos. We reverse because these issues are material under the negligence standard set forth above, and cannot be decided on a motion for summary judgment.

First, the district court found that the shipowner had not been told about the malfunctioning winch, did not know that it did not work properly, and could not reasonably have been expected to know that the winch was defective. There was evidence, however, that the winch had malfunctioned for two days prior to the day of the accident, that the winch failed to stop properly with almost every load, that the shipowner's representatives had been back and forth in the vicinity of the loading operation during the two days prior to the accident, and that both the winch driver and the hatch tender had complained to superiors whose job it was to communicate problems to the shipowner's representatives in the vicinity of the loading operations. If members of the ship's crew knew, or should have known, about the allegedly defective condition of the winch, their actual or constructive knowledge is imputed to the vessel by respondeat superior. *See, e. g., Davis, supra,* 440 F.Supp. at 450–51; *Gallardo, supra,* 435 F.Supp. at 496.

The standard set forth above recognizes that a shipowner ignorant of an unreasonably dangerous condition may be negligent in not protecting longshoremen against it, if "the exercise of reasonable care would [have] discover[ed] the condition." Within these bounds it is correct to say that the "shipowner [has] a duty to use reasonable care to provide a safe place to work." *Brown v. Ivarans Rederi A/S,* 3 Cir., 1976, 545 F.2d 854, 860, fn. 6(a); House Report at 4707, Senate Report at 10; *Solsvik v. Maremar Compania Naviera, S.A.,* W.D.Wash., 399 F.Supp. 712, 715. *Cf., West v. United States,* 1959, 361 U.S. 118, 123, 80 S.Ct. 189, 4 L.Ed.2d 161; *Migut v. Hyman Michaels Co.,* 6 Cir., 1978, 571 F.2d 352, 356; *Hess v. Upper Mississippi Towing Corp.,* 5 Cir., 1977, 559 F.2d 1030, 1033. By this we do not mean an absolute or non-delegable duty to provide a safe place. That notion is gone with unseaworthiness. We only mean that under the circumstances of a particular case, failure to repair dangerous equipment or conditions may be negligent.

A "shipowner's duties to the longshoremen . . . [do not] end when it turn[s] the vessel over to the stevedore in a safe condition." *Bess v. Agromar Line,* 4 Cir., 1975, 518 F.2d 738, 741–42, fn. 8. On the trial of this action, it may develop that the malfunctioning of the braking mechanism began only after the stevedore commenced loading operations. In this connection we note that while a less rigorous duty to inspect may apply where full inspection would interfere with the work of the stevedore, the duty to inspect does not automatically cease once stevedores have come aboard for the first time. *Slaughter v. Ronde,* S.D.Ga., 1974, 390 F.Supp. 637, aff'd per curiam, 5 Cir., 1975, 509 F.2d 973. *Com-*

*pare Gallardo, supra,* 435 F.Supp. at 496; *Espinoza, supra,* 444 F.Supp. at 412–13. In Congress' example of the longshoreman slipping on the oily deck, Congress did not limit the phrase

> substance had been on the deck for such a period of time that it should have been discovered and removed by the vessel in the exercise of reasonable care by the vessel under the circumstances

to oil spilled before the first longshoreman came aboard.

Second, the district court found that the stevedore had exclusive control of the gear and the premises during the relevant time period. Under the standard we have adopted, control would be relevant to the extent that it might limit the shipowner's opportunities to inspect for dangerous conditions or to remedy such conditions. We agree that in some cases, control may play a critical role in determining the appropriate standard of care. Nevertheless, we do not follow those cases which have focused exclusively or primarily on whether the shipowner relinquished control of the stevedoring to the employer of the injured longshoreman. Instead, we focus on the reasonableness of the shipowner's conduct in the light of his practical opportunities to discover defective conditions and remedy them.[7]

Showing that the stevedore or Santos' fellow longshoremen had control to show their concurrent negligence would not be relevant after *Dodge, supra,* and *Shellman, supra,* unless that control could fairly be said to help prove a sole or superseding cause.

While the admitted facts portion of the pretrial order states that the stevedore was in "control of the loading," that stipulation would not require a jury to conclude that the stevedore had exclusive control of the gear and premises. From the record before us, it is not at all clear that the shipowner did not maintain ultimate control over the ship and its gear during the loading. Far from concluding that *only* the stevedore could have had the defective winch repaired, we cannot be certain from the record that the stevedore had *any* authority to repair it.

Third, the district court held that the initial spillage was "caused by the pallet striking the pallet jack." Santos argued the broader view that the defective braking mechanism caused the initial spillage by failing to stop the pallet before it struck the pallet jack. Since the winch driver's deposition testimony supports this broader view, the importance of the braking mechanism as a "cause" of the initial spillage should have been left for the jury.

Fourth, the district court emphasized that after the longshoremen raised the partially spilled pallet they left it to swing back and forth overhead. The amount of swinging, if any, matters a great deal because Santos claims that the remaining sacks of wheat did not loosen because the pallet swung back and forth but because the winch's defective braking mechanism let the pallet keep creeping down, thus requiring the winch driver to keep jerking the pallet back up to the desired height. Since some of the deposition testimony suggested little if any swinging, the amount of swinging as compared with the amount of vertical movement caused by the allegedly defective winch should have been left for the jury.

Finally, the district court applied Restatement (Second) § 343 and § 343A which, as

---

**7.** Cases focusing on relinquishment of control include *Cox v. Flota Mercante Grancolombiana, S.A.,* 2 Cir., 1978, 577 F.2d 798; *Briley v. Charente S.S. Co., Ltd.,* 5 Cir., 1978, 572 F.2d 498, 500; *Hickman v. Jugoslavenska Linijska, Etc.,* 2 Cir., 1978, 570 F.2d 449, 451–52; *Hurst v. Triad Shipping Co.,* 3 Cir., 1977, 554 F.2d 1237, 1249–253; *Munoz v. Flota Merchante Grancolombiana, S.A.,* 2 Cir., 1977, 553 F.2d 837, 840–41. *See also, Restatement (Second) of Torts,* §§ 409, 414 (1965); *Talliercio v. A/S D/S Svenborg & D/S of 1912 A/S,* S.D.N.Y., 1978, 451 F.Supp. 949, 951–52; *Lemon v. Bank Lines, Ltd.,* S.D.Ga., 1978, 449 F.Supp. 1016, 1020–021; *Valle v. Jugoslavenska Linejska Provibda,* S.D.N.Y., 1977, 434 F.Supp. 608, 611–12; *Croshaw v. Koninklijke Nedlloyd, B.V. Rijswijk,* D.Ore., 1975, 398 F.Supp. 1224, 1229–231. *Cf. Chavis v. Finnlines, Ltd., O/Y,* 4 Cir., 1978, 576 F.2d 1072, 1079–080, *quoting Riddle v. Exxon Transportation Company,* 4 Cir., 1977, 563 F.2d 1103, 1111–112; *Teofilovich v. d'Amico Mediterranean Pacific Lines,* C.D.Cal., 1976, 415 F.Supp. 732, 739.

we have seen, incorporate the substance of the defenses of contributory negligence and assumption of risk. In applying those sections, the court concluded that the "jumpiness" of the winch was open and obvious, and that both because the plaintiff's activities were dangerous, and because the plaintiff recognized some of the dangers, he could not recover as a matter of law. These findings also require reversal. They demonstrate that the district court actually relied upon the limiting provisos, §§ 343(b) and 343A, in deciding to grant summary judgment. Thus, its mistaken view of the law cannot be said to have been harmless error.[8]

As an alternate ground of decision, the district court concluded that the "defective condition of the winch had only a remote cause-in-fact relationship to plaintiff's accident and could not have been the proximate cause thereof as a matter of law." Because the district court based this conclusion in part on factual findings which we have just indicated should have been left for trial, we cannot sustain the district court's dismissal on this alternate ground. We thus do not consider whether, if we had sustained the factual findings, we would have agreed that the defective condition could not have been found a proximate cause of the accident as a matter of law.

The judgment is reversed and the case is remanded for further proceedings consistent with this opinion.

---

**8.** We note that the standard we adopt today is very similar to the standard set forth in Restatement (Second) of Torts § 343 and § 343A, minus the limitations placed on recovery under those provisions by § 343(b) and § 343A(1).

Had the district court not relied on the limiting provisions of the Restatement invitee rule, the error of law may have been harmless. However, as we have noted, the district court did rely on the limiting provisos.