SEA QUEST MARINE, INC., a
corporation, Plaintiff,

v.

COVE SHIPPING, INC., a corporation;
and Cove Tankers, a corporation,
Defendants.

Admiralty No. C78–686B.

United States District Court,
W. D. Washington.

Memorandum of Decision
Aug. 25, 1980.

Supplemental Memorandum of Decision
Oct. 2, 1980.

Mark E. Johnson of Lane, Powell, Moss & Miller, Seattle, Wash., for plaintiff.

Roy J. Moceri and Dennis Smith of Reed, McClure, Moceri & Thonn, Seattle, Wash., for defendants.

MEMORANDUM OF DECISION

BEEKS, District Judge.

In this action, plaintiff seeks indemnification from the owners of the steam tanker, MOUNT NAVIGATOR, for benefits it paid (as a self insurer) under the Longshoremen's and Harbor Workers' Compensation Act to Merle Boast, an employee, for injuries sustained by him while working in the vessel's forepeak area on May 23, 1974. At the time the vessel was undergoing extensive repairs and maintenance which took 6–7 months to complete and employed 80–100 men.

Plaintiff predicates liability of defendants ("Cove") on the alleged negligence of Ernest Kachikis, a consultant engaged by Cove in connection with the work and its only representative on board the vessel, who dispatched Boast to work in an unlighted area of the forepeak.

Cove admits Boast fell through a deck opening but contends that the area in question was under plaintiff's control, that plaintiff was negligent in failing to provide Boast with a safe place to work and in assigning him, an inexperienced worker, as a lead man or working foreman in charge of a crew of 15 men. It further contends that there was adequate lighting in the area to which Boast was assigned, but that he was injured in an unassigned area and was negligent in failing to discover an obvious peril.

Before addressing these contentions, it is necessary to dispose of plaintiff's objections (1) to Exhibits A–11 and A–12, the former being a handwritten statement signed by

Kachikis on June 20, 1978, the latter being a typed copy thereof, and (2) to the testimony of Kachikis in his deposition based on said statement.

During the course of the trial, the court admitted both exhibits into evidence in connection with Cove's defense of laches for the limited purpose of demonstrating the extent of the loss of memory of a key witness. This ruling was made prior to the court having an opportunity to read the deposition of Kachikis, but since reading it, I am satisfied that my ruling was erroneous. It clearly appears that much if not most of Kachikis' testimony concerning the circumstances of Boast's injury came not from personal recollection, but from reference to a document which Kachikis did not prepare; and the existence of which he cannot satisfactorily explain. Furthermore, there is no testimony that he read the statement or had it read to him before signing, or that the statement accurately sets forth the information given by him to the lawyer who prepared it. In brief, there is no legal basis for its admission into evidence for even a limited purpose. Therefore, the exhibits and testimony based thereon are stricken.

As appears hereafter, the exact place that Boast fell is not free from doubt but it is established that it was in the forepeak. The forepeak is that area of the ship between the collision bulkhead and the stem and has three decks. The uppermost deck is the foc'sle deck which is exposed to the weather. The next deck below is the main or shelter deck, and the space between the foc'sle deck and the main deck is known as the upper forepeak. The deck below the shelter deck is the 'tween deck, and the space between these decks is known as the lower forepeak.

During the morning of May 23, 1974 Boast and some of his crew were assigned by Kachikis to work in the forepeak. The lights in the area did not function and Boast was instructed by Kachikis to proceed to the ship's equipment room for a ladder, bulbs and flashlights. Only one flashlight was available. It was held by an unidentified fellow workman, but it provided sufficient light in the darkened area that Boast was able to locate the sockets and screw in the bulbs. Thereafter, Boast struck his head on an unidentified object, stumbled and fell into and through an opening in the deck which he described as a dark hole. There is no evidence as to what the man with the flashlight was doing at and immediately preceding the fall.

There is no admissible evidence that the hatch depicted in Exhibits A–1 through A–5 is the hatch through which Boast is alleged to have fallen.

There are no known witnesses to the fall. Kachikis says Boast fell through the hatch shown in said exhibits at the main deck level (upper forepeak) to the 'tween deck below (lower forepeak), a distance of 12 feet, but Kachikis never witnessed the fall and his testimony is based on hearsay. Boast is unable to state where he fell.

There is no evidence of the number of hatch openings in the forepeak area. There is evidence, however, that two exist, one on the foc'sle, four feet square, with a coaming of unknown height, and another, the one seen in Exhibits A–1—A–5, inclusive, two feet, six inches square, with a coaming twenty inches high. It is the latter hatch that plaintiff claims Boast fell through, although Boast is unable to verify this contention.

Frankly, it is difficult for me to believe that a man of Boast's stature, as revealed in court, could fall in the manner described by him.

Although the parties have stipulated Boast fell down a hatch, he did not so testify. As previously indicated, Boast said he fell through a dark hole in the deck. They are not the same. A ship has two types of deck openings, hatches and manholes. A hatch is a rectangular opening in a ship's deck affording access to the compartment below, the coaming is the raised borders about the edge of the hatch. On the other hand, a manhole is a round or oval shaped opening usually found in tanks. (The vessel was a tanker.) The manhole is covered by a steel cover which fits tightly

into the manhole—similar to the covers we see every day on our streets covering access to sewers, water mains, etc. See International Maritime Dictionary, pages 357, 157 and 487.

I note in plaintiff's Exhibit A–5 (behind the open hatch as it appears in the photograph), a manhole cover of sufficient size that a large man could walk along the deck and fall through it.

There is no evidence with respect to the cover or the location of the hole it was designed to cover. In fact, neither has even been mentioned. One would suspect, however, that there is an uncovered manhole somewhere in the area, possibly providing access to the chain locker or a forepeak tank.

There is no evidence as to the location of the opening through which Boast fell, its dimensions, or whether it had a coaming. Although Kachikis mentions two possibilities, there is no credible evidence as to who uncovered the opening in question, when it was uncovered, or whether Kachikis, or anyone acting for Cove, had notice, actual or constructive, that it was uncovered.

To recover from Cove, plaintiff must establish by a preponderance of the evidence that the injury to Boast proximately resulted from the negligence of Cove. The fact of injury necessitating payment of compensation under the Longshoremen's and Harbor Workers' Compensation Act is admitted. The applicable standard of care owed by Cove to Boast, as an invitee, is set forth in *Santos v. Scindia Nav. Co.*, 9th Cir., 598 F.2d 480, 1980 AMC 155.

This case should be best known for what the evidence does not establish. As a result of the basic omissions indicated, I am unable to apply the Santos standard and I have no alternative but to dismiss the complaint.

It is regrettable that the case must be so decided. However, inability to recall events which occurred more than six years ago is the expectable result of the passage of time.

This memorandum of decision shall constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

## SUPPLEMENTAL OPINION

BEEKS, District Judge.

Trial on the issue of liability was had on July 8, 1980 and subsequently, on August 25, 1980, this court dismissed plaintiff's complaint for lack of evidence to support a finding of Cove's negligence. Plaintiff thereafter filed a motion to alter or amend the court's judgment, but because it was not timely filed, it was stricken.

Subsequent to rendering my memorandum of decision, I have been furnished a transcript of the testimony of Merle Boast which, together with the deposition testimony of Ernest Kachikis, I have read and considered on a number of occasions.

There is much confusion with respect to the facts involved herein due to a lack of definitive evidence, inconsistencies within the testimony of each witness, and an obvious conflict between the testimony of Boast and Kachikis. As a result of this confusion, the memorandum of decision indicated that I could not determine through which opening in the forepeak area of the vessel Boast fell.

The following excerpts from the testimony of Kachikis (by deposition) and Boast will emphasize why I was confused:

Deposition of Kachikis (parts have been stricken as inadmissible): [1]

*Page 16, lines 12–25*

(Questions by counsel for defendant)

Q Now on the day [of the accident] do you recall the area where Mr. Boast was working on the vessel?

A He was working in the forepeak.

Q The forepeak of the vessel would be in what relation to the main deck?

A It is on the main deck, the foremost part of the vessel.

---

1. The previous memorandum of decision struck all testimony in the deposition of Kachikis that was based upon a statement which Kachikis did not himself prepare.

Q On top of the forepeak, is there a hatch?

A Yes.

Q What is it called?

A Forecastle head and it's called the *forepeak hatch.*

*Page 17, lines 16–20*

Q [Boast and his crew] were working in the area of the forepeak doing what?

A [Stricken]

Q And you accompanied them into that area?

A Yes.

*Page 18, lines 6–13*

Q Do you have an opinion as to whether that area was adequately lit for the purposes of the . . . work they were doing?

A Yes.

Q Was the forepeak hatch also open at the time that they commenced work?

A Referring to the sketch [either Exhibit A–7 or A–9], yes. It was opened because I indicated it open.

*Page 20, lines 2–18*

Q Did [Boast] advise you what hatch he had fallen into?

A Yes, he did.

Q Is that hatch shown on any of these photographs which have been marked?

A Yes, this is the *lower forepeak hatch* and this is the hatch in which he fell.

Q Would you turn that over and see what number it is?

A Exhibit 5. [A–5]

Q That shows the hatch in which he advised you he had fallen into?

A Yes, here's another picture of it.

Q Which number is that?

A No. 4 [A–4], and also this one, No. 2 [A–2], and this one, No. 1 [A–1].

*Page 22, lines 17–21*

Q Captain [Kachikis], you have indicated that some of the photographs show the hatch that apparently Mr. Boast fell through. What does that hatch lead to?

A The lower forepeak. This is the upper forepeak.

*Page 39, lines 10–18*

(Questions by counsel for plaintiff)

Q Now you mentioned something about lights in the area of work. Were there other areas in the forepeak that were not lit?

A Only the area where he fell and where he fell into.

Q There wasn't any light in that area?

A The natural light. The forepeak area was open like I indicated on this diagram. The *forepeak hatch* was open, and it's right below here where he fell into. [Referring to Exhibit 8].

*Page 62, lines 23–25, Page 63, lines 1–2*

Q [Boast] indicated to you that he fell through the *upper forepeak hatch*?

A No, the *lower forepeak.*

Q To the lower forepeak hatch?

A Okay. All right.

*Page 63, lines 21–25, Page 64, lines 1–22*

Q You have a sketch for us that we are going to end up marking as Exhibit 8. There is a little square near the bow of the ship. What does that indicate?

A That's the *lower forepeak hatch.*

Q The *upper forepeak hatch* was the hatch that he fell through?

A That's the one he fell through.

Q Put upper forepeak, then.

MR. JOHNSON: There is some confusion here. [an understatement!] It depends on what you call it. It's the hatch leading from the deck of the forepeak into the lower forepeak.

Q That's the hatch leading from the upper forepeak area to the lower?

A No. This is the *lower forepeak hatch.* There are only two.

Q It would be the level–

A On the main deck.

Q Right below the forecastle head?

A Right, *lower forepeak hatch.*

Q And the area below that would be another compartment?

A Would be the lower forepeak.

Q So you call that the *lower forepeak hatch.* I was in error when I called it

the *upper forepeak hatch*. (Emphasis added throughout)

Counsel for both parties are equally in error in calling the hatch through which Boast fell, as they did in their stipulation of facts, simply the "forepeak hatch."

The testimony of Boast did not clear up the confusion as it existed with respect to the various names given to the elusive hatch. With reference to where he fell, Boast said this:

Testimony of Merle Boast at trial:

*Page 8, lines 11–16*

Q What happened to you when you tripped?

A At which time, I fell forward. And when I fell forward, I put my hands out and there was nothing but air and I hit my head across something. At which time, my reflection is I flipped back up and I started to fall again, so I ducked and I went head first into *the hole*.

*Page 14, lines 4–8*

THE COURT: Let me ask you a question here. I'm looking at what has been marked as Exhibit A–1. Is this the hatch that you fell in, the one that's shown in this picture?

A I don't know.

*Page 21, lines 16–17*

Q Do you know what *upper forepeak hatch* means?

A No, I don't.

That the parties stipulated to Boast falling through the "forepeak hatch" is clear. What is equally clear is that at no place in the record is any single hatch clearly referred to as the "forepeak hatch" by any witness or by counsel. In addition to references to "the hatch," "the upper forepeak hatch," "the hole," and "the lower forepeak hatch," Kachikis, Boast, and their counsel have also referred to either of two hatches as:

"hatch that went down to the lower forepeak" [Deposition of Kachikis, page 48, lines 4–5];

"hatch above that went to the forecastle head" [*Id.*, page 48, lines 5–6];

"hatch overhead of the forepeak" [*Id.*, page 49, line 18];

"hatch that led from the forecastle head down into the forepeak" [*Id.*, page 51, lines 11–12]; and

"the forecastle head hatch" [*Id.*, page 53, lines 6–7].

Further adding to the confusion, particularly in connection with the testimony of Kachikis, was the use of the words "this," "there," and "that" referring to points and differences between points on the exhibits without indicating in any manner which the court can now comprehend what was referred to in many vital instances. Such misuse and misidentification of items vitally necessary for a determination of issues not only add to confusion but may torpedo what otherwise may have been a provable case.

Boast fell through the forepeak hatch. The court is bound by this stipulation. It was not intended to indicate otherwise in the memorandum of decision. The mention of the manhole, so obviously apparent in the photograph marked as defendant's Exhibit A–5 and which better fits Boast's description of the aperture through which he fell, was merely to raise the possibility that an alternative explanation of the alleged fall might exist.

The court is now convinced, however, that the statement in the memorandum of decision that there was insufficient evidence to enable the court to identify the location of the opening through which Boast fell is inaccurate.

Furthermore, after considerable further consideration of the evidence, the court is now able to make and does make the following findings of fact:

(1) The upper forepeak consists of that area between the foc'sle deck (the deck exposed to the weather on the foc'sle head) and the main deck, the first deck below the foc'sle deck.

(2) The lower forepeak consists of that area below the main deck and the 'tween deck (the next deck below the main deck).

(3) Access to the upper forepeak is gained through the hatch opening on the foc'sle head called the upper forepeak hatch. Access to the lower forepeak is gained through the hatch opening on the main deck.

(4) The hatch through which Boast fell is located on the main deck and is properly referred to as the lower forepeak hatch leading to the lower forepeak. It is portrayed in defendant's Exhibits A–1 through A–5 inclusive.

(5) The forepeak area consists of all space between the collision bulkhead and the stem and is entered through a water tight door in the collision bulkhead at the main deck level (marked on Exhibit A–9). The forepeak is divided by an intermediate athwartships bulkhead entered by a door on the starboard side. The work area is that corner space to starboard of the chain locker where the main deck and intermediate bulkhead join (marked on Exhibit A–9).

(6) Boast entered the work area with another workman through the door in the intermediate bulkhead. His companion held a flashlight which enabled Boast to locate and screw in light bulbs. He screwed in one bulb and it did not work. He then went to another socket and screwed in another bulb with the same result. He never pulled the switch or attempted to locate the switch by use of the flashlight (later Kachikis pulled the switch and the lights were illuminated). Instead he became upset, walked away from the other workman who was holding the flashlight, stumbled and fell into the hatch.

(7) "Upset" may mean several things. Whether in this instance it was a temper tantrum or some other manifestation of frustration, the court does not know. It did, however, cause Boast to act unreasonably. After making successful use of his companion with the flashlight in locating the sockets and changing the light bulbs, he failed to act with due care for his own safety when he abandoned the bearer of the flashlight and proceeded blindly into a dark nonwork area where he had no reason to be. There is not a scintilla of evidence to indi-

cate that work was being performed or about to be performed in the area where Boast stumbled and fell. Furthermore, the area in which he fell was not an avenue of ingress or egress from the work area nor did it lead to exit therefrom, such exit and the entrance to after areas being the doors heretofore described in the intermediate and collision bulkheads. The court finds this action by Boast to be the proximate cause of his fall and resulting injuries.

To the extent that this supplemental memorandum of decision is inconsistent with any finding made by the court in its original memorandum of decision dated August 25, 1980, this memorandum shall control and constitute the court's findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure. The court confirms the prior dismissal and directs that defendant have and recover its costs herein to be taxed.